**Joseph B. DOHERTY, Sr.,**
**Plaintiff, Appellee,**

v.

**DOHERTY INSURANCE AGENCY,**
**INC., Defendant, Appellant.**

**No. 88–1626.**

United States Court of Appeals,
First Circuit.

Heard Feb. 10, 1989.
Decided June 23, 1989.

Frank J. Shealey, Chatham, Mass., for defendant, appellant.

Sheldon H. Ganz, Boston, Mass., with whom Karen Dean-Smith was on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

A district court jury found for plaintiff Joseph Doherty on his contract claim for monthly retirement payments against defendant Doherty Insurance Agency ("Insurance"). The latter now contends that the district court erred in denying its motions for a directed verdict, judgment notwithstanding the verdict and a new trial; that Doherty's claim was barred by the statute of frauds; and that the district court abused its discretion by commenting to the jury about the evidence. Finding no merit to these contentions, we affirm.

## I.

In 1978, Joseph Doherty retired from his family business at the age of 68, after 32 years of service. On a monthly basis thereafter, Insurance provided Doherty with retirement benefits in a stipulated amount. In 1982, however, family relations fractured, and a newly elected board of directors voted to terminate Doherty's retirement payments. Soon after the checks ceased to arrive, Doherty brought this diversity action in the United States District Court for the District of Massachusetts, alleging breach of Insurance's oral promise to pay retirement benefits for Doherty's remaining life. The parties agreed that Massachusetts law applied. *See Moores v. Greenberg*, 834 F.2d 1105, 1107 n. 2 (1st Cir.1987) (where parties agree what substantive law applies, federal court sitting in diversity jurisdiction should comply).

A four-day jury trial ensued. The district court denied Insurance's motions for a directed verdict made at the close of Doherty's case, and again after the close of all the evidence. A special verdict form containing three interrogatories was put to the jury. The first inquired whether,

Before the defendant corporation was organized in June, 1956, did James Doherty on behalf of the partnership of William and James Doherty promise plaintiff Joseph Doherty that if Joseph joined them in their business in Andover and worked with them for the balance of his working days, his compensation would include retirement benefits for his remaining life?

The jury answered "yes" and went on to the next question:

Before the defendant corporation was organized in June, 1956, did plaintiff promise in exchange to join William and James Doherty in their business in Andover and work with them for the balance of his working days?

The jury also answered this question "yes" and went on to the final question:

Did the defendant corporation [Insurance] assume the aforesaid agreement between plaintiff and the partnership of William and James Doherty?

The jury responded "yes." The court entered judgment for Doherty in accordance with the jury's verdict, and denied Insur-

ance's post-trial motions for judgment notwithstanding the verdict and for a new trial.

## II.

Insurance asserts that the district court erred in denying Insurance's motions for a directed verdict and for judgment notwithstanding the verdict. The court erred only if all the evidence, viewed most favorably to Doherty, would not permit reasonable jurors to find for him. *deMars v. Equitable Life Assurance Society of the United States*, 610 F.2d 55, 57 (1st Cir. 1979). We set forth the facts in the light most favorable to Doherty.

Joseph Doherty is one of five Doherty children: four sons—John, Bill, Joe (the plaintiff), and Jim—and a daughter, Margaret. In the mid–1930s, the second son, Bill, founded a small insurance and real estate agency in Andover, Massachusetts. In 1937, Jim joined the business. In 1946, the two brothers formed an unincorporated partnership. Most of the company's business was insurance sales, but the brothers occasionally would also sell real estate. In 1955, Bill discovered that he was seriously, perhaps terminally, ill. Concerned that Jim would be left to run the family business alone, Bill and Jim sought the help of other family members. They first asked John, who refused to join the business. They then turned to Joe.

In 1955, Joe Doherty was 45 years old. He had earned a Bachelor's degree from Boston College, and later a Master's degree in Education from Harvard University. In 1951, he and his family moved to Easthampton, Connecticut, where he served as the superintendent of schools. By 1955, Joe had built up 18 years of equity in school retirement plans.

In September or October of 1955, Jim called Joe and arranged to meet with him at the Ocean House, in Swampscott, Massachusetts, where New England school superintendents were holding an annual meeting. After the meeting, the two brothers sat on the back steps of the Ocean House, and Jim told Joe about Bill's illness, and asked Joe to join the family business. Jim related the full terms of the employment offer: salary, a company car, and insurance. Joe asked Jim about retirement. Jim responded that retirement would be taken care of, and agreed that Joe would retire at salary.

Joe took several months to consider Jim's offer. In the meantime, he received an offer to serve as superintendent of schools in a New Jersey district, a position which would have been more challenging, with greater potential for advancement, than his position in Easthampton. He also was offered a renewal of his contract in Easthampton. In mid-February of 1956, Joe prepared a list of the "pros" and "cons" of joining in the family business in Andover. Among the "cons" listed was "all retirement benefits wasted," but among the "pros" was "improved retirement plan." Sometime in March of 1956, Joe informed his brothers that he had decided to accept their offer. The brothers and their families met at a restaurant in Sturbridge, Massachusetts, for a luncheon to celebrate Joe's decision. During the lunch, Joe removed the list from his pocket, and told his brothers that he had prepared a "pros and cons list." Subsequently, Joe and his family moved to Andover, and he began working with his brothers in July 1956.

Upon Joe's move to Andover, the brothers formed two corporations, Doherty Insurance Agency, Inc. ("Insurance") and Doherty Realty Agency, Inc. ("Realty").[1] Insurance was the corporate successor to Jim's and Bill's earlier partnership. Bill and Jim were the sole shareholders of Insurance, but the three brothers held equal shares in Realty. The three brothers served as directors for each of the two corporations. Joe was elected president of both corporations. The two corporations shared a small office in Andover.

Upon Joe's arrival, the three brothers agreed that the first order of business was for Joe to obtain a license to sell insurance. Joe was tutored for his insurance exam, and after obtaining his insurance license

---

1. The real estate corporation originally was named "Doherty Brothers Realty, Inc." The name later was changed to "Doherty Realty Agency, Inc."

late in the summer of 1956, attended an intensive five-week course about insurance. Joe subsequently became a real estate broker and an appraiser, and worked primarily in the real estate side of the business, but throughout the course of his employment he attempted to sell insurance and performed acts which benefited Insurance as well as Realty, including signing insurance policies, signing corporate checks, referring business to Insurance, and obtaining financing for Insurance. Joe enjoyed a successful career in the real estate business. In later life, he held many prominent positions in local, regional and national real estate associations. He was elected president of the National Association of Realtors in 1974. For the first few months of his employment, Joe was employed by Insurance, but received his salary from Realty. From late 1956 until Joe's retirement in 1978, however, Insurance paid Joe's weekly salary.

The two corporations' operations were merged in many respects. At all times, the two corporations were located in the same office space. Insurance's employees performed all clerical work for both corporations. The financial accounting of the two corporations was controlled by Jim, who used the same accountant to prepare financial reports and tax returns for both corporations. Although Joe worked primarily in the real estate business, most matters pertaining to his employment were handled by Insurance. In addition to receiving his salary from Insurance, Joe was covered under Insurance's medical plan, had life insurance through Insurance, and was listed as a full-time employee of Insurance. The three brothers shared equally in annual profit sharing payments received by Insurance from insurance companies for whom Insurance wrote policies. Joe drove a company automobile leased for him by Realty, which bore signs front and back advertising "Doherty Realty and Insurance." For a period of time, Insurance charged Joe's salary to Realty as a "management fee." Realty never repaid the fee, which simply was carried on Insurance's financial books as an asset and on Realty's as a liability.[2] The rationale underlying this arrangement was that Realty needed capital and, in Jim's words, "we did business on a family basis and we did not worry too much about keeping an accurate [account of what was] owed." After the arrangement was abandoned, and at least until 1978, Realty owed Insurance $115,000 to pay for Joe's services.

In 1970, Bill retired from Insurance at full salary. In 1975, just before Joe's 65th birthday, Jim "reminded" Joe that Joe was eligible for retirement on the same terms as those enjoyed by Bill. Joe retired on January 1, 1978. Initially, he received payments in the amount of $2,000 per month, on checks drawn on Insurance's corporate bank account. Later, the amount was reduced slightly to an amount representing Joe's salary less any social security benefits he received. Jim retired in 1980 on the same terms. Insurance's financial statements reflected the retirement payments to the three brothers (and others) under the heading "Commitments." The statements for the years 1977–1981 noted, "The Agency has unfunded deferred compensation agreements with four former officers and employees; whereby, the Agency is required to pay benefits aggregating [varying amounts from year to year] annually for their remaining lives."

Upon Jim's retirement, the business passed on to the next generation. Jim's children ran Insurance, while some of Joe's children were responsible for Realty. In 1981, a dispute arose, and Joe's children left the business. At the next meeting of Insurance's board of directors, on January 5, 1982, Jim's children voted to terminate Joe's retirement payments. Joe never received another retirement check from Insurance. However, the pension payments to Jim and Bill were continued. Insurance's 1981–1982 financial statement reflected this change, noting, under the heading "Commitments," that "The Agency has *revocable* unfunded deferred compensation agreements...." (Emphasis added.)

---

**2.** This arrangement later was abandoned when a bank informed the brothers that it was a sham, since there was no payback schedule or interest accrual on the debt.

■ We are satisfied that a reasonable jury could, from these facts, find for plaintiff Joseph Doherty. The discussion between Joe and Jim on the steps of the Ocean House in 1956, as related by Joe, supports Joe's claim that the brothers exchanged mutual promises concerning the terms of Joe's future employment, including Jim's promise to pay lifetime retirement benefits. The parties' subsequent conduct tends to confirm the existence of such a promise. Joe forfeited 18 years of accrued retirement benefits in order to work with his brothers. Joe's "pros and cons" list included the "pro" of an improved retirement plan. Many years later, Jim "reminded" Joe that he would be eligible to retire at full salary upon his 65th birthday. Insurance's financial statement tended to confirm an agreement, and Insurance actually paid Joe's pension for four years before recharacterizing the agreement as "revocable" and terminating the pension checks. A reasonable jury could have inferred from this history that retirement at full salary was part of the basic understanding between Jim and Joe.

■ Insurance contends the evidence was insufficient to support the verdict because Realty, rather than Insurance, should be deemed to have assumed whatever agreement was made to provide Joe with retirement benefits. Joe was primarily in real estate, and there was evidence tending to show that Joe was employed by Realty. However, lines between the two family corporate entities were extremely blurred. And there was evidence indicating that it was Insurance that had assumed the employment agreement between Joe and the Doherty Brothers partnership.[3]

Insurance treated Doherty as an employee—Insurance paid Doherty's salary and provided his medical and life insurance. The three brothers shared equally in profit sharing checks received by Insurance. After Doherty retired, Insurance paid Doherty's retirement benefits for almost four years. On its financial statement, Insurance listed Doherty's retirement payments as a corporate "Commitment," and changed the statement to reflect that the payments were "revocable" only after the board of directors had voted to terminate Doherty's payments.

There also was substantial evidence that Insurance knew the terms of and benefited from the agreement with Joe. Insurance was corporate successor to the Doherty Brothers partnership, which entered into the original agreement with Joe. The jury could have inferred from this, and from the evidence that Bill and Jim were Insurance's only stockholders, that Insurance knew the terms of the agreement with Joe. Further, there was evidence that Joe's performance of his promise benefited Insurance. Joe obtained his insurance license, attempted to sell insurance, signed insurance policies, signed Insurance corporate checks, and worked on behalf of Insurance to obtain critically needed financing. Doherty served as Insurance's president and director for 32 years. Even Doherty's company car, provided by Realty, bore signs advertising both Insurance and Realty.

We conclude that the district court did not err in leaving it to the jury to resolve the parties' dispute over the existence of a retirement agreement for Joe.

### III.

■ Insurance urges that the district court should have granted its motion for a new trial because the verdict was against the weight of the evidence and was the result of sympathy for the plaintiff.

[T]he district court may order a new trial only if it is convinced that the jury's verdict is "against the clear weight of the evidence, or is based upon evidence

---

3. In Massachusetts, "[a] corporation succeeding a partnership is liable on the contracts or obligations of the latter where it either assumes them under express agreement or where the facts and circumstances are such as to show an assumption." *Pittsfield General Hospital v. Markus,* 355 Mass. 519, 521, 246 N.E.2d 444, 445 (1969). Assumption of a contract may be implied if a corporation accepted the benefits of a contract with knowledge of its terms. *See Framingham Savings Bank v. Szabo,* 617 F.2d 897, 900 (1st Cir.1980) (applying Massachusetts law).

which is false, or will result in a clear miscarriage of justice...." *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.), *cert. denied*, 459 U.S. 1087 [103 S.Ct. 571, 74 L.Ed.2d 933] (1982). The mere fact that a contrary verdict may have been equally—or more easily—supportable furnishes no cognizable ground for granting a new trial. If the weight of the evidence is not grotesquely lopsided, it is irrelevant that the judge, were he sitting jury-waived, would likely have found the other way. And if the judge rejects a new trial motion, we review his application of this hard-to-achieve standard solely for abuse of discretion.

*Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1333–34 (1st Cir.1988). The weight of the evidence here was not "grotesquely lopsided" in Insurance's favor. Insurance's position at trial was that if any corporate entity had assumed Joe's employment contract, it was Realty rather than Insurance. However, as discussed in Section II, *supra*, there was ample evidence for the proposition that Insurance had assumed Joe's employment contract. The jury's decision that Insurance assumed the contract was not against the weight of the evidence.

Insurance denied that Jim ever made a promise to provide retirement benefits. Jim testified that he did not recall discussing retirement during the meeting at the Ocean House. This difference raised an issue of credibility for the jury. In balancing Joe's evidence of a promise against Jim's failed recollection, we cannot say that the clear weight of the evidence favored defendant's position. The district court did

not abuse its discretion in denying the motion for a new trial.

## IV.

■ Insurance argues that enforcement of the oral contract for lifetime employment, including retirement benefits, is barred by the Massachusetts statute of frauds,[4] because it was impossible for the parties to perform the contract within a year. Mass.Gen.Laws ch. 259, § 1(5) (1986).[5] Massachusetts courts, however, have consistently ruled that "[t]his clause of the statute [exempting contracts capable of performance in a year's time] applies only to contracts which by their terms cannot be performed within the year. It does not apply to contracts which may be performed within, although they may also extend beyond, that period." *Rowland v. Hackel*, 243 Mass. 160, 162, 137 N.E. 265, 265 (1922). *See also Joseph Martin, Inc. v. McNulty*, 300 Mass. 573, 577, 16 N.E.2d 4, 6 (1938) (explaining and quoting from *Peters v. Westborough*, 19 Pick. 364, 367, 36 Mass. 364, 367 (1837) ("[a]ny understanding that the agreement was not to be performed within a year 'is to be absolute and certain, and not to depend on any contingency'")); *Bolton v. Van Heusen*, 249 Mass. 503, 506, 144 N.E. 384, 385 (1924) ("[w]hen it does not appear that a contract cannot in any event be performed within a year, then it is not within the statute of frauds...."); *Novel Iron Works v. Wexler Construction Co.*, 26 Mass.App.Ct. 401, 410–11, 528 N.E.2d 142, 147–48, *review denied*, 403 Mass. 1104, 530 N.E.2d 797 (1988). A contract for lifetime employment is not subject to the statute of frauds, because the contract may be performed

---

**4.** We do not agree with Joseph Doherty that Insurance waived this issue by failing to plead the statute of frauds as an affirmative defense in its answer to Doherty's complaint. Before filing its responsive pleading, Insurance raised the statute of frauds in a motion to dismiss or, in the alternative, for summary judgment, which the district court denied. The notice of appeal filed by Insurance specifies that one of the judgments appealed from is "The Interlocutory Decision ... denying Defendant's Motion to Dismiss Plaintiff's 'contract claim' on alleged Statute of Frauds grounds."

**5.** The statute provides:

**Actionable contracts; necessity of writing.** No action shall be brought: ... [u]pon an agreement that is not to be performed within one year from the making thereof; [u]nless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized.

Mass.Gen.Laws ch. 259, § 1(5) (1986).

within one year if the employee happens to die within the year. *See Elwell v. State Mutual Life Assurance Co.*, 230 Mass. 248, 253, 119 N.E. 794, 796 (1918) ("The defendant ... might have died ... and the contract even if it might continue for years could be fully completed within one year."); 3 S. Williston, *Williston on Contracts* § 495, at 579–80 (3d ed. 1960) (cited in *The Johnson Clinic, Inc. v. Huffnagle*, 2 Mass. App.Ct. 837, 837, 310 N.E.2d 628, 629 (1974)).

The cases cited by Insurance are not to the contrary. Both *Richard Tucker Associates, Inc. v. Smith*, 395 Mass. 648, 481 N.E.2d 489 (1985), and *Irving v. Goodimate Co.*, 320 Mass. 454, 70 N.E.2d 414 (1946), cited by Insurance, held that oral contracts for *a term of years* were proscribed by the statute of frauds because they could not be performed within a year. *Tucker*, 395 Mass. at 650, 481 N.E.2d at 491 (three-year lease); *Goodimate*, 320 Mass. at 458, 70 N.E.2d at 416 (term of employment for more than a year). A contract for a term of years is distinguishable from one for an individual's lifetime. In the case of a contract for a term of years, a party who dies cannot be said to have "performed" the contract. Instead, the contract is one which is subject to "defeasance or cancellation" by the death of the party during the term of the agreement. *See Huffnagle*, 2 Mass.App.Ct. at 837, 310 N.E. 2d at 629; 3 S. Williston, *Williston on Contracts*, § 498A (3d ed. 1960) (cited in *Huffnagle, supra*); *Restatement (Second) of Contracts* § 130 comment b, illustration 5 (1979) (Oral contract falls within the statute of frauds where A promises to work

for B and B promises to employ A for five years. "Though the duties of both parties will be discharged if A dies within a year, the duties cannot be 'performed' within a year.").

The fact that the present contract provided for retirement benefits and that the instant dispute, arising during Joe's senior years, pertains to the payment of compensation during retirement, does not indicate that the contract could not have been performed within its initial year, had Joe had the misfortune to die then, while still in his 40s. The jury expressly found that in exchange for Joe's promise to join his brothers in Andover and "work with them for the balance of his working days," Jim (on behalf of Insurance) promised that Joe's "compensation would include retirement benefits for his remaining life." If Joe were to have died within the year, he would have completely fulfilled his promise to work "for the balance of his working days" (because his working days would have been over), and Insurance would have fulfilled its promise to compensate him for his remaining life.[6] The contract was analogous, therefore, to a contract for lifetime employment rather than to one for a term of years.[7] This oral agreement falls outside the statute of frauds, because it "may [have been] performed within, although [it] may also extend beyond, [a one-year] period." *Rowland*, 243 Mass. at 162, 137 N.E. at 265. The oral agreement was enforceable under Massachusetts law.

## V.

▇ Finally, Insurance complains that, in instructing the jury about corporate as-

---

**6.** If Joe had died before retirement, Insurance would not have been required to provide retirement benefits. Insurance's promise was to provide retirement benefits for the duration of Joe's life *after* completion of his "working days." If Joe had died during his working days, he would have had no remaining life during which to pay retirement. Therefore, upon Joe's death, Insurance would have fully performed its promise even though it never paid retirement benefits.

**7.** Insurance, indeed, concedes in its appellate brief that the brothers' agreement was for lifetime employment. Insurance says that "[i]n

this case, there was no contested question of fact as to length of contract; it was to be *life-long employment* of a 46 year old male and *no shorter period was ever mentioned ....*" While an agreement to work for one's "working days" may differ technically from an agreement to work until one's death, the effect, for purposes of the statute of frauds, is the same. Under either circumstance, the promise to work will be fully performed upon the promisor's death, and the statute of frauds is inapplicable because the agreement was one that was capable of being performed within a year of the contract's making.

sumption of a partnership's contracts, the court overstepped its privilege to comment on the evidence by discounting the significance of evidence showing that Joe held stock in Realty, but not in Insurance. Also objectionable, in Insurance's view, were comments that, since no dividends ever were paid on the stock, the court thought it more significant that the brothers shared equally in the insurance bonuses paid to Insurance. Insurance contends that this comment impermissibly took from the jury an issue of ultimate fact—whether Realty, rather than Insurance, assumed the agreement to pay Joe's retirement benefits.

It is well settled that a federal district judge may explain and comment upon the evidence to draw the attention of the jury to those parts which the court thinks important. *See Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 698, 77 L.Ed. 1321 (1933). A judge may "analyze and dissect the evidence, but he may not either distort it or add to it." *Id.* at 470, 53 S.Ct. at 699. *See also United States v. Moore,* 571 F.2d 76 (2nd Cir.1978). It is permissible for a judge to "express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination." *Quercia,* 289 U.S. at 469, 53 S.Ct. at 699. *See also United States v. Silvestri,* 790 F.2d 186, 189 (1st Cir.), *cert. denied,* 479 U.S. 857, 107 S.Ct. 197, 93 L.Ed.2d 129 (1986).

The court's comment here on the relevance of the three brothers' relative stockholdings was well within the boundaries of its discretion. The comment merely addressed the relevance and importance of certain evidence with respect to whether Insurance had assumed the agreement. It neither distorted the evidence nor added to it. In the midst of the comment, the court reiterated that it was ultimately up to the jury to decide, the jury being "by all means ... the bosses on fact questions." [8]

Insurance also complains that the court, in its jury instructions, erroneously decided for the jury the question whether there existed an agreement to pay retirement benefits. The offending comment occurred during the court's instruction about corporate assumption of a preexisting contract, when the court stated,

[w]e're talking now of the second prong of this assumption point, an implied assumption. The important issue with reference to the benefit to the insurance corporation from the pre-existing contract between the partnership and the Plaintiff—which I'm assuming, *now that you've found that there was a promise made now to pay him retirement benefits* —is what the understanding of the parties was.

(Emphasis added.) Viewed in context, it is clear that the court's statement was made hypothetically. The court previously had explained to the jury that its task was to decide each special interrogatory sequentially. Only if the jury decided that the parties had exchanged mutual promises would it reach the question asking whether Insurance had assumed the partnership's agreement with Doherty. There was no error.

*Affirmed.*

---

**8.** At the beginning of its charge to the jury, the district court also stated,

[A federal judge] may state his opinion on the factual issue, provided he emphasizes to the jury that they're not bound by what he says.... [Y]ou take an oath at the beginning of your service to decide fact issues in accordance with the law. But if I make a statement with reference to a fact question, it's not binding upon you. You're the sole and exclusive judges of the facts. What I say, if I do refer to fact issues, will be designed to be helpful to you in your deliberations, just like the attorneys' closing arguments and statements in opening argument are designed to be helpful to you. But what they say about the facts is not binding on you and what I say about the facts is not binding upon you.