959 F.2d 230
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
SAFETY MUTUAL CASUALTY CORP., Plaintiff, Appellee,
v.
LIBERTY MUTUAL INSURANCE CO., Defendant, Appellant.
 No. 91-1993.
 United States Court of Appeals,
First Circuit.
 March 30, 1992
 
 Steven A. Rusconi with whom Susan E. Grondine, Michael J. Skeary, Mark E. Cohen, Marc LaCasse and McCormack & Epstein were on brief for appellant.
 G. Trenholm Walker with whom Andrew K. Epting, Jr., Wise & Cole, P.A., Cynthia J. Cohen and Meehan, Boyle & Cohen, P.C. were on brief for appellee.
 Before Selya, Circuit Judge, Bownes, Senior Circuit Judge, and Cyr, Circuit Judge.
 BOWNES, Senior Circuit Judge.
 
 
 1
 Defendant-appellant, Liberty Mutual Insurance Company, appeals from a summary judgment in a declaratory judgment action granted to plaintiff-appellee, Safety Mutual Casualty Corporation. Liberty was the primary insurer of the Zayre Corporation, a Massachusetts-based retailer which does business throughout the country. Safety was Zayre's excess carrier. The bread and butter issue is whether Safety is liable on its policy because of the settlement by Liberty of a lawsuit against Zayre. Liberty has agreed not to seek recourse under its policy against Zayre for the costs of its settlement of the suit. Instead, it is pursuing, as Zayre's subrogee, the claim that Safety's excess policy was implicated by the settlement. The parties in interest are, therefore, Liberty and Safety. For purposes of this appeal we do as the parties have done, and treat Liberty as the sole defendant-appellant.
 
 
 2
 The legal issue is whether, in light of the undisputed facts, late notice by Liberty to Safety of a lawsuit against Zayre relieved Safety of liability to Liberty. We hold that it did.
 
 THE POLICIES
 
 3
 Prior to 1985 Zayre had primary general liability insurance coverage through the American Mutual Insurance Company. Under the terms of its policy, American agreed to pay all expenses incurred by Zayre in defending personal injury claims, including any judgments assessed against it. There was an aggregate limit of $500,000 on personal injury claims. The American policy also had a deductible of $100,000 per occurrence.
 
 
 4
 For the policy period from November 1, 1984, through November 1, 1985, Zayre purchased an excess insurance policy from Safety. This policy had a five million dollar personal injury limit. The coverage schedule of Safety's policy directly incorporated the coverages of American's policy.
 
 
 5
 On December 1, 1984, Zayre replaced its American policy with a policy issued by Liberty. This policy differed significantly from that of American. Liberty's policy lowered the deductible from $100,000 to $500 per occurrence and raised the limit of coverage per occurrence to one million dollars for personal injury claims. Unlike American's policy, Liberty's policy, as originally written, did not have an aggregate limit for personal injury claims. Liberty claims that it and Zayre agreed to raise the personal injury aggregate from $500,000 to one million dollars, but the new aggregate was omitted due to clerical error.
 
 
 6
 The notice provisions in Safety's policy were as follows:
 
 
 7
 3 Insured's Duties in the Event of Occurrence, Claim or Suit:
 
 
 8
 a) In the event of an occurrence, reasonably likely to exceed the retained limit, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the Insured to the Corporation or any of its authorized agents as soon as practicable.
 
 
 9
 b) If claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Corporation every demand, notice, summons or other process received by him or his representative.
 
 THE UNDISPUTED FACTS
 
 10
 In October of 1985 Kenneth Geringer was arrested while attempting to leave a Zayre store in Dade County, Florida, with a computer printer. Zayre accused Geringer of taking the printer without paying for it. Geringer claimed that a store employee had authorized him to exchange his broken printer for a working one. The police arrested both Kenneth Geringer and his wife, although Mrs. Geringer was not implicated in the exchange. Mrs. Geringer was booked and strip-searched by the police. On December 15, 1987, the Geringers filed an action for false imprisonment against Zayre in Florida state court.
 
 
 11
 Liberty defended Zayre at all stages of the lawsuit. Its retained attorney, Charles H. Sinclair, wrote Liberty a pretrial evaluation report. The salient points of the report are as follows:
 
 LIABILITY:
 
 12
 Good against us as to Alissa Geringer. According to our own security people, she was not with her husband at the time the merchandise was exchanged, and therefore was not involved in the "crime." However, the Geringers may defeat themselves on the liability issue because they appear to be poor witnesses and liars.
 
 DAMAGES:
 
 13
 Mrs. Geringer is claiming total psychiatric disability and serious agoraphobia as a result of this incident. This is confirmed by Dr. Bolasini, who feels she is totally disabled from post-traumatic stress disorder.
 
 
 14
 ...
 
 
 15
 ....
 
 EVALUATION:
 
 16
 The security employees of Zayre make horrible witnesses, saying whatever comes to mind and contradicting each other and even themselves. Any false arrest case has an emotional overlay with a jury, and a jury could get angry at the actions of the Zayre employees. I evaluate our chances of winning this case at 30-40%, and if this case is lost, I feel it has a jury range of between $40,000.00 and $50,000.00.
 
 SETTLEMENT STATUS:
 
 17
 The last offer was $25,000.00. The most recent demand for settlement was $150,000.00. Based upon discussions with the plaintiffs' attorney, I do not feel that the Geringers would accept any settlement less than $75,000.00.
 
 
 18
 A copy of this report was not sent to Safety.
 
 
 19
 Just prior to trial the Geringers reduced their demand to $90,000. Liberty offered $75,000. The case went to trial. On August 2, 1988, a jury found Zayre liable to both plaintiffs. The jury awarded Kenneth Geringer $50,000 for actual damages and $500,000 in punitive damages. It awarded
 
 
 20
 Mrs. Geringer $700,000 for actual damages and one million dollars in punitive damages. No notice of the Geringer lawsuit was given Safety until August 9, 1988, nearly a week after the 2.5 million dollar verdict.
 
 
 21
 Liberty settled the case for one million dollars on or about September 20, 1988. The Geringer settlement combined with other personal injury settlement payments made by Liberty brought Liberty's total payments on behalf of Zayre to approximately 1.6 million dollars. On October 18, 1988, Liberty notified Zayre in writing that Liberty had exhausted and exceeded the one million dollar personal injury aggregate, which it claimed its policy provided. On December 6, 1988, March 29, 1989, and June 8, 1989, Liberty, on behalf of itself and Zayre, made formal written demands on Safety: that Safety reimburse Liberty for amounts paid in excess of the one million dollar personal injury aggregate (approximately $664,375), that Safety reimburse Liberty for the costs and expenses incurred by it in handling personal injury claims, and that Safety assume the defense of open claims pending against Zayre. Safety responded by bringing this action for declaratory judgment under 28 U.S.C. § 2201; jurisdiction was based on diversity of citizenship, 28 U.S.C. § 1332(a)(1).[1]
 
 
 22
 The district court held: "Because Zayre breached the notice provisions of its contract with Safety with respect to the Geringer case, and Safety was prejudiced as a result, Safety is not liable to Zayre, or to Liberty as subrogee of Zayre, for any portion of the settlement paid to the Geringers." For the reasons that follow, we agree.
 
 ANALYSIS
 
 23
 We are aware, of course, that in reviewing a summary judgment the material facts must be viewed in the light most favorable to the party opposing the judgment. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). And summary judgment is appropriate only when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).
 
 
 24
 Because this is a diversity case state law applies. The parties have proceeded here and in the district court on the assumption that Massachusetts law controls. The district court relied on Massachusetts law. In light of this, we will follow Massachusetts law. See Doherty v. Doherty Ins. Agency, Inc., 878 F.2d 546, 547 (1st Cir. 1989) (where parties agree what substantive law applies, federal court sitting in diversity jurisdiction should comply); Moores v. Greenberg, 834 F.2d 1105, 1107 n.2 (1st Cir. 1987) (same).
 
 
 25
 We start our analysis by stating that we agree with the district court that notice provision 3 b) of Safety's policy applies. Liberty argues strenuously that 3 a) is implicated. A comparison of the wording of the two notice provisions reveals how hollow Liberty's argument is. The first two lines of 3 a) state: "In the event of an occurrence, reasonably likely to exceed the retained limit, [notice shall be given, etc.]" The balance of the paragraph describes the particulars of the notice. Provision 3 b) states: "If claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Corporation every demand, notice, summons or other process received by him or his representative." Liberty, of course, would like to argue that it was not "reasonably likely" that the Geringer suit would "exceed the retained limit." But it cannot avoid the immediate notice requirement of 3 b) "if suit is brought against the Insured." Liberty had an absolute duty under 3 b) to forward to Safety a copy of the process in the Florida suit "immediately." This requirement was completely disregarded by Liberty; nothing was sent to Safety and no notice of the Geringer suit was given Safety until after the jury verdict. This is not a case involving the definition of the word "immediately." The notice provision of 3 b) was never complied with at all.
 
 
 26
 Notwithstanding this breach of the notice provision of Safety's policy, Liberty argues that Safety was not entitled to summary judgment because, under Massachusetts law, in order to escape liability Safety must show that it has been prejudiced as the result of the late notice. Liberty maintains that there is a question of material fact as to whether Safety was prejudiced by Liberty's late notice of the Geringer lawsuit.
 
 
 27
 We turn to the controlling principles of Massachusetts law. In Johnson Controls, Inc. v. Bowes, 409 N.E.2d 185 (Mass. 1980), the Supreme Judicial Court first established the requirement that where
 
 
 28
 an insurance company attempts to be relieved of its obligations under a liability insurance policy ... on the ground of untimely notice, the insurance company will be required to prove both that the notice provision was in fact breached and that the breach resulted in prejudice to its position.
 
 
 29
 Id. at 188 (citations omitted). The court's recent decision in Augat, Inc. v. Liberty Mutual Insurance Co., 571 N.E.2d 357 (Mass. 1991), provides a summary of the case law since Johnson Controls:
 
 
 30
 We have previously ruled that a showing of actual prejudice is required where the insurer seeks to disclaim coverage based on the violation of a provision requiring: that the insured promptly notify the insurer of a claim; that the insurer consent to a settlement affecting a claim; or that the insured cooperate in the event of a lawsuit. These decisions rejected the traditional, contractual approach to the interpretation of insurance policies, whereby breach of a policy provision would automatically relieve the insurer of liability. This traditional approach, we stated in Johnson Controls, "fails to recognize the true nature of the relationship between insurance companies and their insureds. An insurance contract is not a negotiated agreement; rather its conditions are by and large dictated by the insurance company to the insured. The only aspect of the contract over which the insured can 'bargain' is the monetary amount of coverage." Johnson Controls, supra, quoting Brakeman v. Potomac Ins. Co., 472 Pa. 66, 371 A.2d 193 (1977).
 
 
 31
 Therefore we held that the violation of a policy provision should bar coverage only where the breach frustrates the purpose underlying the provision. Notice, consent-to-settlement, and cooperation provisions share a common purpose, we ruled: to give an insurer the opportunity to protect its interests. Accordingly, we held that an insurer seeking to disclaim liability because of a breach of one of these provisions must demonstrate that the breach actually prejudiced the insurer's position.
 
 
 32
 Id. at 361 (Massachusetts citations omitted).
 
 
 33
 The facts and holding of Augat are particularly significant to the instant case. In Augat, the Supreme Judicial Court affirmed a grant of summary judgment in favor of an insurer where the insured, Augat, had breached a policy provision requiring that it refrain from "voluntary payment" of settlement costs. Id. at 358. The dispute over coverage arose when Augat, a manufacturing company, agreed to pay the costs of cleanup of water contamination on its property, rather than face a suit for treble the cost of cleanup by the Commonwealth of Massachusetts. After entry of a consent order with the Commonwealth, Augat notified its insurer that a "situation [had] arisen ... which may give rise to a claim" within the coverage of its comprehensive general liability policy. Id. Nearly two and one-half years later, Augat finally informed its insurer of the consent order, and demanded reimbursement for approximately four million dollars in actual and anticipated cleanup costs. Id. at 358-59.
 
 
 34
 After the insurer denied coverage for the cleanup costs, Augat sued in Massachusetts Superior Court. The court granted the insurer summary judgment, ruling that Augat had breached the clause of its policy that provided that "[t]he insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident." Id. at 359 & n.3. The Supreme Judicial Court affirmed the Superior Court, holding that the undisputed facts entitled the insurer to judgment as a matter of law. Id. at 361. In so doing, the Supreme Judicial Court distinguished Johnson Controls and its progeny. It held:
 
 
 35
 This analysis leads to a different result when applied to the facts of this case. Here too the purpose of the policy provision in question is to give the insurer an opportunity to protect its interests. In this case, however, the record clearly establishes that Augat's breach of the voluntary payment provision undermined that purpose. After Augat agreed to a settlement, entered into a consent judgment, assumed the obligation to pay the entire cost of cleanup, and in fact paid a portion of that cost, it was too late for the insurer to act to protect its interests. There was nothing left for the insurer to do but issue a check. We conclude, therefore, that no showing of prejudice is required in this case, and that entry of summary judgment in favor of [the insurer] was correct.
 
 
 36
 Id.
 
 
 37
 In light of the undisputed facts in this case, we hold that Augat controls and that the district court correctly held that Safety was prejudiced by Liberty's failure to give notice until after the jury verdict.
 
 
 38
 The purpose of the notice provision in Safety's policy was to give Safety an opportunity to learn about a suit that had been brought against its insured and evaluate its potential. The undisputed facts establish that Safety was completely deprived of its right to learn that a lawsuit had been filed against its insured and about the liability-damages risk involved. Like the insurer in Augat, Safety was deprived of the opportunity to protect its interests. Liberty only sent notice to Safety after it realized that settlement of the Geringer claims after the 2.5 million dollar verdict would likely put it over the one million dollar aggregate limit that Liberty believed its policy established. Like the insured in Augat, Liberty has spent the money and is now demanding that Safety issue the check. Furthermore, we note that Liberty, unlike the lay insured protected by Johnson Controls and its progeny, is an insurance company and as such must be presumed to have understood the importance of the notice provisions of Safety's policy.
 
 
 39
 Liberty locked the barn door after the horse was stolen and now wants Safety to pay for the horse. Such a result is unwarranted as a matter of undisputed fact and unjustified as a matter of law.
 
 
 40
 The judgment of the district court is Affirmed. Costs awarded to Appellee.
 
 
 
 [1]
 The case was originally filed in the United States District Court for the Northern District of Illinois, Eastern Division, but was transferred to the United States DistrictCourt for the District of Massachusetts