**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MANAGED CARE PROFESSIONALS,
INCORPORATED,
<u>Plaintiff-Appellee,</u>

v.                                                                                    No. 97-2158

MEDLANTIC HEALTHCARE GROUP;
WASHINGTON HOSPITAL CENTER,
<u>Defendants-Appellants.</u>

MANAGED CARE PROFESSIONALS,
INCORPORATED,
<u>Plaintiff-Appellant,</u>

v.                                                                                    No. 97-2159

MEDLANTIC HEALTHCARE GROUP;
WASHINGTON HOSPITAL CENTER,
<u>Defendants-Appellees.</u>

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge;
T. S. Ellis, III, District Judge.
(CA-96-1002-A)

Argued: April 6, 1998

Decided: October 1, 1998

Before NIEMEYER, Circuit Judge, PHILLIPS, Senior Circuit Judge,
and CHAMBERS, United States District Judge for the Southern
District of West Virginia, sitting by designation.

_____

Affirmed by unpublished opinion. Senior Judge Phillips wrote the opinion, in which Judge Niemeyer and Judge Chambers joined.

_____

**COUNSEL**

**ARGUED:** Catherine Anne Bledsoe, Lawrence Stephen Greenwald, GORDON, FEINBLATT, ROTHMAN, HOFFBERGER & HOL-LANDER, L.L.C., Baltimore, Maryland, for Appellants. Howard Dennis Scher, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, L.L.P., Philadelphia, Pennsylvania, for Appellee. **ON BRIEF:** Howard J. Bashman, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, L.L.P., Philadelphia, Pennsylvania, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

This is a diversity action in which Managed Care Professionals, Inc. ("MCPI") sued Washington Hospital Center ("WHC") on claims arising from a dispute concerning the interpretation of a service contract. Pursuant to this contract, MCPI's predecessor entity, Managed Care Professionals ("MCP"), agreed to review WHC's patient account records, identify potential underpayments by third-party health care payors, and pursue collection of these underpayments in exchange for a 50% commission on the collections.[1] Less than a year into the contract, WHC terminated the agreement because MCPI allegedly violated its terms. MCPI then brought suit for breach of contract claiming $5.5 million in damages. Following discovery, WHC moved

_____

[1] Medlantic Healthcare Group, the other named defendant, is the corporate entity that controls WHC.

2

for partial summary judgment on $3.8 million of the $5.5 million of MCPI's claimed damages. The district court granted the motion and restricted MCPI's potential recovery to compensation for those underpayments already recovered. At trial, the jury found that WHC breached the contract and awarded MCPI $500,000 in damages. WHC's motion for judgment as a matter of law was denied. WHC now appeals the district court's denial of its motion for judgment as a matter of law and MCPI cross-appeals the court's limitation of damages ruling. We affirm on both the appeal and cross-appeal.

I.

In 1993, Linda Olson formed MCP, a sole proprietorship, to provide consulting services to hospitals and other medical providers. As part of its services, MCP would review a hospital's payment records to determine whether a health care payor owed money on patient accounts for which they had not paid all or part of the bill. Over the course of the two-year period after its formation, MCP contracted with the INOVA health system in Virginia to identify and collect underpayments at three Virginia-based hospitals.

In June 1995, Olson completed negotiations with Susan Manselle, director of Patient Financial Quality Services at WHC and Cecilia Moore, assistant vice president for Patient Financial Services at WHC. Pursuant to their arrangement, MCP agreed to identify and collect underpayments owed to WHC by certain third-party payors. In return for recovering unpaid funds from designated patient accounts, MCP would receive 50% of the collections.

Memorialized in a letter from Olson to Moore, the agreement provided that MCP would perform a "Retrospective Payment Audit" to uncover account underpayments and to pursue recovery from the appropriate third-party payor. As part of this process, MCP would "provide specifications of the data to be extracted from the patient account system" and WHC would "provide [MCP] with as much of the requested data as possible."

After MCP received the information, it would, "as a first step, review all contracts and applicable correspondence, and perform a match/merge against the WHC patient accounting files utilizing [ ]

3

custom software to identify potential accounts for follow-up/negotiations by MCP." Once MCP identified likely accounts for recovery, MCP was then responsible for undertaking collection efforts. If, however, WHC opted to pursue collection internally or through another vendor, the agreement specified that MCP was still entitled to 50% of the funds collected from identified accounts. And, the agreement was to remain in effect until collections of all under-payments were complete for reviewed accounts from January 1993 to March 1995.

After the agreement was signed, MCP sent instructions to WHC about the type of information it would need. WHC then forwarded a computerized profile of between 75,000-100,000 patient accounts to MCP. Processing this information, MCP created a list of approximately 18,000 accounts identified as potential candidates for under-payment and concluded that WHC was owed almost $17.5 million. MCP then sent this list to WHC to alert them to the accounts that MCP intended to pursue for collection under the contract. Manselle received the list and "flipped through it" without reviewing it in detail.

Around this time, MCP filed articles of incorporation and, after receiving state approval, became Managed Care Professionals, Inc. Following the structural change, the business continued as before with Olson remaining the sole owner.

After identifying those accounts on which WHC appeared to be owed money, MCPI proceeded with its collections efforts. In September 1995, MCPI submitted its first invoice for monies that it had recovered for WHC and, after the amount was approved through WHC's review process, was paid $37,290.23. MCPI submitted its second invoice in October. About this time, WHC received complaints from two managed care payors about MCPI's actions. Eric Wagner, vice president of WHC's Managed Care Department, asked that MCPI cease further contact with managed care payors pending an investigation. MCPI complied with this request but continued to evaluate identified accounts.

In reviewing MCPI's second invoice, both Wagner and Manselle realized that MCPI was seeking to be paid on accounts that were clas-

4

sified as open and active. Manselle recommended that MCPI not be compensated for collection of these payments because she understood the agreement to extend only to those accounts which WHC had closed or "given up on." WHC had a patient financial services department, staffed by 40-50 representatives, whose duties were to bill and collect payments on open accounts. Notwithstanding the internal concern, Moore, on behalf of WHC, issued MCPI a check for $39,045.00 on November 8.

In December 1995, February 1996, and March 1996, respectively, MCPI submitted three more invoices for its 50% share of $2,360,146 in collections on identified accounts. Determining that approximately $2,000,000 of these funds were actually collected from open, active accounts, WHC refused to pay MCPI on any of the invoices. On April 10, 1996, WHC sent MCPI a letter terminating the contract.

MCPI then brought this action seeking damages of approximately $5.5 million, on claims of breach of contract, defamation, and tortious interference with contract. On the breach of contract claim, MCPI sought recovery both of the unpaid invoice amounts and an amount that it alleged would have been earned had WHC not breached by prematurely terminating the contract. Following discovery and the dismissal of the defamation and tortious interference claims, WHC moved for partial summary judgment as to damages on the breach of contract claim. Contending that MCPI had failed to present any but speculative evidence as to the amount it might have earned had WHC not terminated, WHC asserted that MCPI should only be able to recover damages, if any, based upon those accounts identified by MCPI for which WHC had received payments. Applying Virginia law, as the parties agree was proper, the district court granted WHC's motion so limiting potential damage recovery on the ground that MCPI's claim for $3.8 million in post-termination damages was too speculative.

At trial, the jury awarded MCPI $500,000 in damages on the breach of contract claim. In a post-verdict motion for judgment as a matter of law, WHC argued that the "Retrospective Payment Audit" agreement covered only closed or written-off accounts and alternatively that MCPI could not recover on an agreement memorialized with Olson to which it was not a party. The district court denied the

5

motion. WHC now appeals that order and MCPI cross-appeals the summary judgment order dismissing part of its damage claim as speculative.

II.

Preliminarily WHC, invoking alternatively standing, real party in interest, and mutuality of obligation grounds, argues that MCPI cannot enforce the contract because it was not an initial signatory. WHC emphasizes that Olson signed the agreement as President of MCP, a sole proprietorship, and argues that WHC never acquiesced or agreed to MCPI's assumption of the contract. MCPI was not formed until about a month after the contract was finalized and, according to WHC, is a legal stranger to the contract.

Under whatever legal theory WHC's contention is assessed, it must fail because the underlying premise is erroneous. WHC undoubtedly could sue MCPI for breach or any other cause of action arising under the contract. The general rule is that a corporation, although not in existence at the time of the contract, can be held liable on the contract if it ratified or adopted the contract by its actions. Knop v. McMahan, 872 F.2d 1132, 1142 (3rd Cir. 1989); Doherty v. Doherty Ins. Agency, Inc., 878 F.2d 546, 550 (1st Cir. 1989) ("A corporation succeeding a partnership is liable on the contracts or obligations of the latter where it either assumes them under express agreement or where the facts and circumstances are such as to show an assumption."). In turn, "[b]ecause a corporation can be held liable for a contract which it has ratified, it necessarily follows that the corporation should also have the right to enforce the terms of the contract including any warranties." Blackwood Coal Co., Inc. v. Deister Concentrator Co., Inc., 626 F. Supp. 727, 730 (E.D. Pa. 1985); accord 18 Am.Jur.2d Corporations § 130 (1985) ("A corporation that has ratified or adopted a contract made for it by its promoters may, after its formation, sue to enforce the contract or to recover for its breach.").

WHC's arguments on this issue are also undermined by the plain language of the actual contract and WHC's conduct in complying with it. For reasons not explained, MCPI, despite not being in existence at the time, is mentioned in the contract seven times. In fact, the final page of the contract confers upon MCPI, as opposed to MCP,

6

the rights and obligations contained in the provisions on that page. Next, in undertaking its internal contract compliance review, WHC repeatedly identified the entity performing and receiving payment under the contract as Managed Care Professionals, Inc. WHC also issued payment on its first invoice in the form of a check to "Managed Care Professionals, Inc." Under these circumstances--where MCPI succeeded MCP, was mentioned in the contract, and was treated by WHC as a party to the contract--we find that MCPI is a proper party in this action and is entitled to recover for any breach by WHC. We therefore address the merits of WHC's appeal and MCPI's cross-appeal.

III.

WHC argues that the district court erred in refusing to grant its motion for judgment as a matter of law dismissing MCPI's breach of contract claim in its entirety. We review that ruling de novo, applying the same standards as the district court to determine whether the evidence, when viewed in the light most favorable to MCPI, would have permitted a reasonable jury to render a verdict in its favor. Andrade v. Mayfair Mgmt. Inc., 88 F.3d 258, 261 (4th Cir. 1996). In making that assessment, we must give MCPI the benefit of all reasonable inferences and may not weigh the evidence, assess the credibility of witnesses, or base any decision on materially contradicted evidence. Al-Zubaidi v. Ijaz, 917 F.2d 1347, 1348 (4th Cir. 1990).

The interpretive disagreement in this case results from the contract's failure plainly to specify the scope of MCPI's account review obligation or otherwise to indicate whether it covered not only closed or abandoned, but also open or active accounts. Under Virginia law, as generally, where a contract is facially ambiguous, the parties may introduce extrinsic evidence to construe the contract. See Westmoreland-LG&E Partners v. Virginia Elec. & Power Co., 486 S.E.2d 289, 294-95 (Va. 1997). If such evidence does not render the contract unambiguous and "could lead fair-minded persons to different conclusions," the jury becomes the final arbiter of the proper construction. Atkinson Dredging Co. v. St. Paul Fire & Marine Ins. Co., 836 F. Supp. 341, 344 n.8 (E.D. Va. 1993) (quoting Nehi Bottling Co., Inc. v. All-American Bottling Corp., 8 F.3d 157, 161 (4th Cir.

7

1993)). Here, both parties rely almost exclusively on extrinsic evidence to support their positions.

WHC argues that no reasonable jury could have interpreted the contract as encompassing open or active accounts. First, WHC proffers the testimony of Robert Gricius. Gricius assisted in the preparation of the contract and his company was apparently a joint venturer with Olson in the WHC arrangement. When questioned at trial, Gricius explained that "[a] retrospective payment audit is an audit of cases that are closed and the accuracy of the payments for those cases." Relying on this testimony, WHC insists that, as a joint venturer and co-drafter of the agreement, Gricius's admission is conclusive evidence, i.e., a judicial admission, that a retrospective payment audit only extends to closed accounts.[2]

Next, WHC points to the expert testimony of Remy Meute, a managed care consultant in the health care industry. He testified that a "[r]estrospective payment audit is a review to see if underpayments were made based upon a final payment or denial of payment from a payor where the hospital has ceased its efforts to collect on the account and it has contractually zeroed the account." When performing this type of audit, "[y]ou are looking at closed patient accounts where the hospital is no longer working on them."

Finally, WHC notes Manselle's testimony that, during the negotiations, she informed Olson that WHC sought review of accounts that it had "given up on" and that Olson then represented that the contract would be a "no-risk" and "no-cost" contract. In Manselle's proffered view, if MCPI was able to generate any funds, it would be solely from closed accounts that WHC had already abandoned.

---

[2] Although Gricius's testimony is favorable to WHC, we do not believe that his comments, even as a joint venturer, should be treated as a judicial admission against MCPI. Instead, we agree with the Seventh Circuit, that "[w]hen a party testifying at trial or during a deposition admits a fact which is adverse to his claim or defense, it is generally preferable to treat the testimony as solely an evidentiary admission." Keller v. United States, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995) (citing Michael H. Graham, Federal Practice and Procedure, § 6726 (Interim Ed. 1992)).

8

MCPI responds that the contract does not define the scope of the accounts which it might pursue, and that in evaluating the parties' mutually manifested intentions by looking to WHC's whole course of conduct and to Olson's testimony, the jury could properly find for MCPI. According to MCPI, on its face, the phrase,"retrospective payment audit," is not limited to closed or written-off accounts. It argues that even an account that is open can include payments for past services that have become due, thus allowing a retrospective audit of this portion of the account. At trial, Olson testified to this effect and explained that, during the drafting of the contract, it was understood that MCPI would review both open and closed accounts for underpayments. She further explained that in her view the mere existence of WHC staff to bill and collect on open accounts did not negate the need for MCPI to check for underpayments that were overlooked.

Consistent with MCPI's interpretation, WHC provided MCPI with data on open, active accounts as well as closed accounts and similarly did not object when MCPI forwarded the list of identified accounts, including both open and closed accounts, that MCPI intended to pursue. WHC even paid MCPI for the collection of funds from open accounts when it approved payments for invoice #2.

Aggregating the evidence in support of MCPI's position, we believe that there was sufficient basis for a reasonable jury to find in its favor. Although WHC offered plausible testimony that the contract should be narrowly construed, we are not permitted merely to weigh the evidence or substitute our judgment for the jury's. See DeJarnette v. Corning Inc., 133 F.3d 293, 297 (4th Cir. 1998). In light of the evidence presented by MCPI, the jury's construction of the contract was not unreasonable and, therefore, the district court properly denied WHC's motion for judgment as a matter of law.

IV.

MCPI cross-appeals the district court's grant of partial summary judgment limiting the damages it might recover. As indicated, the district court ruled that MCPI's damages claims arising out of identified but not yet collected accounts were too speculative for recovery. We review that ruling de novo and must treat the forecast evidence on the summary judgment record in the light most favorable to MCPI as

9

non-movant. See Kimsey v. City of Myrtle Beach , 109 F.3d 194, 195 (4th Cir. 1997).

MCPI of course, bore the burden of proving its claimed damages with reasonable certainty. See Medcom, Inc. v. C. Arthur Weaver Co., Inc., 348 S.E.2d 243 (Va. 1986) (holding damage claim not submissible to jury where the evidence was vague, indefinite, and speculative). To meet this burden, MCI was obligated "to furnish evidence of sufficient facts and circumstances to permit the fact-finder to make at least `an intelligent and probable estimate' of the damages sustained." Dillingham v. Hall, 365 S.E.2d 738, 739 (Va. 1988) (quoting Gwaltney v. Reed, 84 S.E.2d 501, 502 (Va. 1954)).[3]

According to MCPI, WHC was owed millions of dollars from nine different health care payors on patient accounts properly identified by MCPI under its contract but not yet pursued by MCPI or collected by WHC. Under the terms of the contract, were WHC to collect on any of these accounts, MCPI would be entitled to 50% regardless of which party actually secured the recovery. Having been denied the opportunity to pursue the accounts, MCPI had been damaged by any amount that eventually was received on the accounts by WHC. MCPI's proffered proof of that amount consisted of a fifteen-category "matrix" that it claimed could constitute adequate proof of that damage amount. The proffered proof posited a predicted total balance due from health care payors from all accounts, "grouped the accounts by type of accounts as defined by the payment methodology used in the Hospital's contracts with its health care payors, and then applied a

_____

[3] Although the parties frame the damages discussion in terms of lost profits, we do not believe that that special category of damages is implicated in this case. Despite the contingent nature of MCPI's compensation under the contract, the damages it seeks are not actually lost profits. The 50% share of as-yet-uncollected funds is, in fact, the actual consideration promised by WHC to induce MCPI to enter the contract. Lost profits, on the other hand, are derived from the value of some consequence that performance on the contract may produce. 3 Dan B. Dobbs, Law of Remedies, § 12.4(1) (2d ed. 1993). Unlike true lost profits, MCPI does not seek consequential damages arising from WHC's breach. The damages in this case "are general damages because they are based on the value of the very performance promised by defendant and not on some secondary good derived from that performance." Id. at § 12.4(3).

10

discount rate based on the likely recovery on each type of account as reflected by MCPI's prior experience in collecting those types of accounts." (MCPI's Opening Br. at 14-15.) In compiling the discount rate, MCPI relied, where possible, on rates of return from a single contract with the INOVA health system pursuant to which MCPI identified and collected underpayments for three hospitals from one third-party payor, HealthPlus.

At the summary judgment hearing, the district court rejected MCPI's reliance on the collection rates from its prior dealings with INOVA "[b]ecause the situation here involves a different health care provider, that is, the hospital, as opposed to the three hospitals involved in INOVA, different payors, nine as opposed to only Health-Plus, and different contracts, those between the hospital and the nine payors as opposed to INOVA/Health-Plus." (J.A. 982.) Concluding that "MCPI's use of INOVA/Health-Plus collection rates to estimate its collection rates in this case [was] conjectural and unreasonable," the court found that MCPI's "alleged basis for computing damages d[id] not present a reasonable basis upon which to judge, with any degree of reasonable certainty, what the profits would have been." (J.A. 983.) MCPI challenges the district court's grant of summary judgment to WHC on the damage claims based upon nine of the categories listed in the matrix thereby limiting MCPI's claim.

In response, WHC contests both the reliability of the claimed "potential underpayments" and the discount rates used to predict how much of those underpayments would have been collected. According to WHC, MCPI's claim of $17.5 million in undiscounted potential underpayments is meaningless without a means of determining whether the "potential" underpayments are "actual" underpayments that would have been collected "as opposed to claims that would have been rejected by the payors as, e.g., erroneous calculations of amounts due, misinterpretations of the contracts, . . .[and] claims that were properly denied the first time for lack of medical necessity, or pre-authorization. . . ." (WHC's Reply and Answering Br. at 36.) WHC also maintains that use of the collection rates derived from MCPI's contract with INOVA is woefully inadequate because MCPI never demonstrated that there was a substantial similarity between the INOVA-HealthPlus contract and the contracts between WHC and the nine health care payors.

11

We agree that MCPI, relying primarily on the detailed damages matrix, failed to provide sufficient evidence from which a jury could have reasonably estimated how much WHC would have collected from the nine health care payors on the alleged "potential underpayments" if the contract had not been breached. First, MCPI did not adequately support its claim that WHC is owed $17.5 million in underpayments. In fact, a portion of the estimate was apparently approximated from account categories for which MCPI had not even performed detailed account-by-account reviews. Without carefully looking at each account, it is difficult to see how MCPI's estimates could reasonably be considered bona fide underpayments.

More important, the use of collection rates from a single, past experience does not provide a nonspeculative foundation upon which to predict the rate of recovery for underpayments to WHC in this instance. Despite being extended several opportunities to cure proof deficiencies at discovery, MCPI never offered any evidence that the provisions of the INOVA-HealthPlus contract correspond to the provisions of the contract between WHC and the nine payors at issue. In fact, Olson admitted that she never compared the INOVA-HealthPlus contract with the contracts between WHC and its payors for any reason at all. MCPI similarly did not compare differences in hospital procedures or payment policies of the health care payors before it declared the collection rates from the INOVA contract to be transferrable to this case.

We do not mean to imply that MCPI's past experience is per se irrelevant or that a party seeking damages in MCPI's position must have had an identical past experience with both the hospital and health care payors in order to recover damages for potential underpayments. MCPI's joint venturer, Robert Gricius, even explained that there is a way for a particular hospital to predict what percentage of underpayments it is likely to recover without such past experience. According to him, a reliable collection rate can be ascertained by looking at five factors: (1) the payment terms under the hospital's contract with each payor; (2) the hospital's ability to assess the accuracy of payments; (3) the payor's ability to properly adjudicate the claims; (4) the hospital's internal controls; and (5) the payor's historical payment patterns. MCPI's calculations do not appear to be based on these factors; instead, the matrix simply adopts, for the most part,

12

the collection rates from MCPI's singular past experience in collecting underpayments.[4]

Considering the number of factors that can affect whether an identified "potential underpayment" is both accurate and will ultimately be recovered, MCPI's mechanical application of the rates from a single contract with a single health care payor, without more, is insufficient. Where, as here, the jury would have been forced to engage in mere guesswork, the district court properly denied MCPI the right to seek damages on the nine account categories challenged upon appeal.

V.

For the above reasons, we affirm the district court's denial of WHC's motion for judgment as a matter of law and its granting of partial summary judgment to WHC on the issue of damages.

AFFIRMED

_____

[4] For two account categories, MCPI did not even rely on any historical figures but simply selected a self-described "conservative" discount rate of 40%. For another category that apparently did not have a counterpart in the INOVA-HealthPlus contract, MCPI applied the INOVA collection rate for a different category because both accounts were "complicated." The arbitrary selection of discount rates for these categories involves even more conjecture than the application of the INOVA rates to the analogous account categories in the WHC contracts.