Billings, Thomas P., J.
For the reasons that follow, Defendants’ Motion to Dismiss Verified Complaint is ALLOWED in limited part, and otherwise DENIED.
FACTS
This is a dispute over the internal affairs of a corporation (defendant BTU Holdings), incorporated in the Cayman Islands, with three shareholders: the plaintiff Hayat, a citizen and resident of Kuwait, and the individual defendants Al-Mazeedi and Oishi, citizens of Kuwait and Japan (respectively) who reside in Lexington, Massachusetts. The company maintains a mailing address at its lawyers’ offices in George Town, Grand Cayman, but operates out of an office in Wal-tham.
The Court’s allowance of the defendants’ motion to dismiss the original Complaint on ground of forum non conveniens did not withstand appellate review. Hayat v. Al-Mazeedi, 75 Mass.App.Ct. 1105 (Rule 1:20 Decision), F.A.R., denied, 455 Mass. 1108 (2009). After the rescript was received and the case restored to the docket, the plaintiff filed a Verified Amended Complaint. The present motion seeks dismissal of the amended complaint in its entirety under Rule 12(b)(6), for failure to state a claim.
The amended complaint, whose allegations are taken as true for present purposes, asserts that in or around 2000, defendant Al-Mazeedi approached plaintiff Hayat “seeking support, assistance, and involvement in the formation of a business enterprise.” Hayat obliged, providing Al-Mazeedi with financial support both personally and with regard to his business activities, “discussed with him the establishment of various possible enterprises, and introduced him to a network of business contacts.”
In December 2002, the parties together formed BTU Holdings. As its name suggests, BTU Holdings is by now the parent or grandparent of numerous other companies, many of which also have BTU in their names. This “BTU Group” of companies raises capital from outside investors and uses it to acquire equity interests in electrical power generation plants, chiefly or exclusively in Asia. BTU Holdings manages the subsidiaries’ affairs and collects substantial management fees in return.
Al-Mazeedi is the President and CEO of BTU Holdings and manages its day-to-day operations and those of its subsidiaries, out of the Waltham office. The original agreement was that he and Hayat would each own 50% of BTU Holdings’ stock. Hayat was to have a seat on BTU Holdings’ board of directors and participate in all major management decisions of the BTU Group, about whose operations he was to have been kept informed. For his contributions, he would be paid $20,000 per month, with annual 5% increases.
Hayat and Al-Mazeedi subsequently agreed that each would own 44% of the stock, with the remaining 12% available for distribution to employees. Instead, however, Al-Mazeedi and his wife Oishi have kept the 12%, thus giving themselves the majority (56%) stake between them (28% each) and leaving Hayat with a 44% minority share.
In the spring of 2005, Hayat refused to approve a $1 million payment by BTU Holdings to a related company, BTU Ventures, Inc., which provided office support functions to the BTU Group companies. From that time, forward, the defendants have largely refused Hayat’s requests for information concerning the operations of the BTU Group. They stopped paying him his monthly stipend in January 2006.
In conjunction with their freeze-out of Hayat from BTU Holdings, Al-Mazeedi and Oishi have formed other entities. These, like the BTU Group companies, each have BTU in their names and operate in the Asian energy industry, but they are not owned, controlled, or managed by BTU Holdings or its subsidiaries. Hayat is a shareholder only in BTU Holdings, and thus has not shared in whatever bounty these other BTU entities may have bestowed on whoever does own, control, and/or manage them. Also, Al-Mazeedi has diverted substantial sums from BTU Holdings and other BTU Group companies to himself and his family.[1]
In December 2007, Al-Mazeedi had Hayat served with notice of a meeting of BTU Holdings’ Board of Directors, in Waltham, for the stated purpose of removing Hayat from the Board. He refused Hayat’s request for a three-day postponement so that he could travel from Kuwait to Waltham for the meeting. The meeting was held on December 7, as noticed, and the directors in attendance—Al-Mazeedi and Oishi—voted the absent Hayat off the Board.
The defendants “have never made a reasonable offer for Hayat’s share of [BTU] Holdings.” Before bringing this suit, “Hayat, acting through counsel, made a series of written requests in February and March 2008 for [BTU] Holdings to redress his grievances. The requests failed to yield results.”
The Amended Complaint is in four counts:
Count I: Breach of Fiduciary Duly (alleging that “Al-Mazeedi and Oishi breached their fiduciary duties to Hayat by misappropriating funds from Holdings for their own purposes, by diverting monies which ought to have been distributed to shareholders, and by freezing out Hayat”);
Count II: Breach of Contract (based on the agreement to pay Hayat a director’s fee of $20,000 per month, adjusted by 5% annually);
Count III: Diversion of Corporate Opportunity (referring to the transfer of the management agreement and the later $8 million consulting fee received in connection with Meiya Power Company, see footnote *1, supra, and also to the individual *245 defendants’ diversion of BTU Holdings assets “for their exclusive and personal benefit”); and
Count IV: Claim for Declaratory Judgment (seeking a declaration as to “Hayat’s rights as a shareholder of [BTU] Holdings”).
DISCUSSION
As detailed below, much of this case is governed by Cayman Islands law. It is therefore my task to determine, by judicial notice of “any relevant material or source," what Cayman Islands law has to say on several important issues relevant to this dispute. Although testimony may be involved, the Court’s determinations on these matters are “treated as . . . rulingfs] on . . . matter[s] of law.” Mass.R.Civ.P. 44.1.
Both sides have proffered detailed and thoughtful affidavits by well-qualified Cayman attorneys (Graeme Halkerston for the plaintiff; Simon Firth, Andrew Jones, Q.C., and NeilTimms, Q.C. for the defendants). The affidavits are accompanied by copies of cases and other source materials, on the subject of Cayman law and its application to the claims asserted in the complaint. These experts agree on important points; they disagree on others; and they do not, of course, address how Cayman law is to be processed under Massachusetts’ choice of law principles, upon which much depends.
The Cayman Islands, formerly a Crown Colony, now constitute a British Overseas Territory with its own legislature and court system and hence, its own statutes, rules of court, and judicial precedents. Both sides’ Cayman law experts agree that decisional law from the courts of the United Kingdom and members of the British Commonwealth are not binding, but are treated as persuasive, in cases litigated in the Cayman courts, and my reading of the Cayman cases amply confirms this.[2]
A. Count I: Breach of Fiduciary Duty.
Count I purports to state a direct (non-derivative) claim by Hayat against Al-Mazeedi and Oishi for breach of their fiduciary duties “[a]s the directors and majority shareholders in a quasi-partnership company, one that was founded on the basis of a personal relationship of mutual trust and confidence . . . similar to that obtaining between partners.” (Amended Complaint, ¶42.)
Under Massachusetts choice-of-law rules, “the State of incorporation dictates the choice of law regarding the internal affairs of a corporation.” Harrison v. NetCentric Corp., 433 Mass. 465, 471 (2001). It is therefore to the Cayman Islands, and (absent on-point Cayman authority) to the British Commonwealth at large, that one looks for the substantive law governing the relationships among stockholders and directors of a Cayman corporation.
1. Fiduciary Duties of Directors to Stockholders.
As in American law, the British and Cayman authorities unflinchingly characterize the relationship between a director and the corporation as fiduciary in nature. See, e.g., Cayman Islands News Bureau Limited v. Cohen and Cohen Associates Limited, [1988-89] CILR 195 (directors held to “general standards of loyalty, good faith, and the avoidance of a conflict of duty and self interest”).
Imposition of a fiduciary duty running from a director to a shareholder, on the other hand, occurs only in “special circumstances”:
[T]here may be special circumstances in which a fiduciary duty is owed by a director to a shareholder personally and in which breach of such a duty has caused loss to him directly (e.g. by being induced by a director to part with his shares in the company at an undervalue), as distinct from loss sustained by him by a diminution in the value of his shares (e.g. by reason of the misappropriation by a director of the company’s assets), for which he (as distinct from the company) would not have a cause of action against the director personally.
The fiduciary duties owed to the company arise from the legal relationship between the directors and the company directed and controlled by them. The fiduciary duties owed to the shareholders do not arise from that legal relationship. They are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case. Events may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts to the shareholders, or an obligation to use confidential information and valuable commercial and financial opportunities, which have been acquired by the directors in that office, for the benefit of the shareholders, and not to prefer and promote their own interests at the expense of the shareholders.
These duties may arise in special circumstances which replicate the salient features of well-established categories of fiduciary relationships. Fiduciary relationships, such as agency, involve duties of trust, confidence and loyalty. Those duties are, in general, attracted by and attached to a person who undertakes, or who, depending on all the circumstances, is treated as having assumed, responsibility to act on behalf of, or for the benefit of, another person. That other person may have entrusted, or, depending on all the circumstances, may be treated as having entrusted, care of his property, affairs, transactions or interests to him. There are, for example, instances of the directors of a company making direct approaches to, and dealing with, the shareholders in relation to a specific *246 transaction and holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of insider information in the context of negotiations for a take-over of the company’s business; or supplying them specific information and advice on which they have relied. These events are capable of constituting special circumstances and of generating fiduciary obligations, especially in those case in which the directors, for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders.
Peskin v. Anderson, [2001] BCLC 372, 379 (English Court of Appeal, Civil Division); see Feiner Family Trust v. VBI Corp., 2007 WL 2615448 at *7 (S.D.N.Y.2007) (citing Peskin as persuasive authority on Cayman law).
In this case, Hayat has alleged that his fellow shareholder/directors once courted and received his trust and confidence, but have since frozen him out of corporate affairs and profit participation. At least as it appears at the motion-to-dismiss stage, Hayat has alleged the requisite special circumstances for imposition of a fiduciary duty running from directors to shareholder under Cayman law, and breach thereof.
2. Fiduciary Duties of Shareholders Inter Sese.
Hayat’s fiduciary duty claim also addresses Al-Mazeedi’s and Oishi’s duty as majority shareholders to the minority in a closely held, “quasi-partnership” corporation, a theory readily recognizable to the Massachusetts practitioner as a “freezeout” (or Donahue)[3] claim. The choice-of-law issues presented by this aspect of Count I are somewhat more complicated than his claim against Al-Mazeedi and Oishi qua directors.
The Cayman legal experts agree that the Cayman courts, drawing on English precedent, have recognized a species of business corporations denominated “quasi-partnership companies,” in which the principals enjoy
a relationship of trust and confidence similar to that obtaining between partners, which makes it unjust or inequitable for the majority to insist on its strict legal rights. The typical characteristics of such a company are that there should be (i) a business association formed or continued on the basis of a personal relationship of mutual trust and confidence; (ii) an understanding or agreement that all or some of the shareholders should participate in the management of the business; and (iii) restrictions on the transfer of shares so that a member cannot realize his stake if he is excluded from the business.
CVC/Opportunity Equity Partners Limited v. DeMarco, 2002 CILR 77, 88, citing Ebrahimi v. Westbourne Galleries, Ltd., [1973] A.C. 360;[4] compare Donahue, 367 Mass. at 585-88.
The “quasi-partnership” doctrine is broad and flexible, coming to the aid of a minority shareholder who was frozen out of (or “expelled” from) the company’s management and emoluments, as in Ebrahimi; or who sought to be relieved of a stock repurchase agreement with a nominal repurchase price, as in CVC/Opportunity; or who fell victim to a majority scheme to depress the company’s share price in order to acquire the minority’s interest at a bargain price, as in Scottish Co-Operative Wholesale Society Ltd. v. Meyer, [1959] H.L. (Sc.) 324; or who asserted that his share of corporate profits had been reduced in violation of an unwritten understanding, as in O’Neill v. Phillips, [1999] ALL ER 961; or to assist the holders of 50% of the stock of a parent company, who complained that the scion of the family holding the other 50% had misappropriated corporate funds and paid himself for a no-show job with a wholly-owned subsidiary, as in Racklind v. Gross, [2005] W.L.R. 3505. In short: there is room in both English and Cayman substantive law for relaxation of corporate formalities and contractual obligations, where necessary to honor the understandings and expectations of principals who formerly enjoyed a relationship of trust and confidence. Cf. Donahue, supra, and Samia v. Central Oil of Worcester, Inc., 339 Mass. 101, 109 (1959).
The rub is that the “quasi partnership company” doctrine has apparently been restricted in its application, in both England and the Caymans, to statutory winding-up proceedings brought on the “just and equitable” ground. In the Caymans, these fall under section 94(d) of the Companies Law (derived directly from section 222(f) of England’s Companies Act of 1948), which permits winding-up of a solvent company if “the Court is of opinion that it is just and equitable that the company should be wound up.”
It is in applying the statutory term, “just and equitable,” that the courts have engrafted partnership principles onto the corporate form where circumstances warrant. As a matter of statutory construction, the significance is that the “just and equitable” language appears, in the Companies Law (and apparently in the mother country’s Companies Act), only in the winding-up provisions. As Lord Wilberforce, delivering the House of Lords’ opinion in the Ebrahimi (a freeze-out or “expulsion” case[5]), put it:
The foundation of it all lies in the words “just and equitable” . . . The words are a recognition of the fact that a limited company is more than a mere legal entity, with a personality in law of its own: that there is room in company law for recognition of the fact that behind it, or amongst it, there are individuals, with rights, expectations, and obligations inter se which are not necessarily submerged in the company structure. That structure is defined by the Companies Act and by the articles of association by *247 which shareholders agree to be bound. In most companies and in most contexts, this definition is sufficient and exhaustive, equally so whether the company is large or small. The ‘just and equitable’ provision does not. .. entitle one party to disregard the obligation he assumes by entering a company, nor the court to dispense him from it. It does, as equity always does, enable the court to subject the exercise of legal rights to equitable considerations; considerations, that is, of a personal character arising between one individual and another, which may make it unjust, or inequitable, to insist on legal rights, or to exercise them in a particular way.
[1973] A.C. at 379-80, quoted in large part by the Cayman Grand Court in CVC/Opportunity, [2002] CILR at 88.
The quasi-partnership doctrine thus, in certain circumstances, lends to corporate law a flexibility much like our own law does in the case of close corporations. It is, however, a creature of the just and equitable clause of the winding-up section of the Companies Law, and it has therefore been deployed— so far as I can determine—only in cases in which the aggrieved shareholder seeks, at least nominally, a winding-up of the company.
Cayman Islands winding-up proceedings are involved and closely supervised by the court, resembling in many respects an American Chapter 7 bankruptcy or state-court receivership proceeding. See Cayman Island Companies Law (2009 Rev.), §§89-155. The proceeding, if not dismissed or re-routed to an alternative remedy (see below), culminates in a dissolution of the corporation. Id., §151. Plainly, this Court lacks jurisdiction to wind up the global affairs of a foreign corporation. See Olds v. City Trust, Safe Deposit & Surety Co., 185 Mass. 500, 505 (1904); 16A M. Fletcher, Cyclopedia of the Law of Private Corporations, §8097 at 166-67 (2003 Rev.), and cases cited; Restatement (Second) of Conflict of Laws (hereinafter, “Restatement”), §300 (1971).
Not every Cayman winding-up proceeding, however, culminates in a dismissal or a dissolution of the company; indeed, one suspects that such proceedings may be commenced by shareholders seeking “just and equitable” treatment in the courts, but not the company’s demise. Section 95(3) of the Companies Law provides:
If the petition is presented by members of the company as contributories on the ground that it is just and equitable that the company should be wound up, the Court shall havejurisdiction to make the following orders, as an alternative to a winding-up order, namely—
(a) an order regulating the conduct of the company’s affairs in the future;
(b) an order requiring the company to refrain from doing or continuing an act complained of by the petitioner or to do an act which the petitioner has complained it has omitted to do;
(c) an order authorising civil proceedings to be brought in the name and on behalf of the company by the petitioner on such terms as the Court may direct; or
(d) an order providing for the purchase of the shares of any members of the company by other members or by the company itself and, in the case of a purchase by the company itself, a reduction of the company’s capital accordingly.
(Emphasis supplied.)
A Cayman court, therefore, could award in a “just and equitable” winding-up proceeding at least some of the relief that Hayat seeks in this case, and could do so “as an alternative to a winding-up order.”[6] This Court may likewise order such relief, granting that it must stop short of winding up or dissolving BTU Holdings or its affiliates (unless, of course, any of these happen to be incorporated in Massachusetts).
“A court usually![7]] applies its own local law rules prescribing how litigation shall be conducted even when it applies the local rules of another state to resolve other issues in the case.” Restatement §122. In particular, “[t]he local law of the forum determines the form in which a proceeding may be instituted on a claim involving foreign elements.” Id., §124.[8] Of course, choice of law in this area, as others, is to be guided by “a functional approach” that inquires whether maintenance of a claim according to forum law “would advance a substantial forum interest and would not seriously impinge upon the interests of other states.” Nierman v. Hyatt Corp., 441 Mass. 693, 696 (2004) (addressing choice of law regarding statute of limitations), quoting from Restatement, §142, comment g; and see footnote 7, supra.
As the Appeals Court has ruled, Massachusetts has a substantial enough interest in the affairs of a corporation that, while incorporated off-shore, has its operational headquarters here, that the case is to go forward in the Massachusetts courts. Permitting the fiduciaiy claims to be litigated as a civil action—albeit subject to Cayman substantive law as to duty and breach—serves the forum’s interests in regulating “how its judicial machinery functions and how its court processes are administered,” see Restatement §122, Comment a, while also honoring the Cayman interest in providing a just and equitable resolution of claims where fiduciary duties actually do exist.
Count I therefore states a claim upon which relief may be granted against the defendants, in their capacities both as directors and as shareholders. Whether or not in fact the nature of BTU Holdings and its principals’ dealings with one another have given rise to fiduciary obligations under Cayman substantive law; if so, whether the majority’s conduct toward Hayat has transgressed such duties; and what if any *248 relief Hayat may be entitled to as a result, cannot be resolved on a motion to dismiss.
B. Count II: Breach of Contract.
The issues presented by Hayat’s claim for breach of an alleged agreement that he would be paid $20,000 a month are, happily, somewhat more straightforward than those under Count I. The defendants’ motion to dismiss Count II is based, in part, on the vagueness of the allegations regarding the agreement (who was to pay him, and for how long?), and in part on the statute of frauds.
1. Sufficiency of Count II under the Iannacchino Standard.
As to defendant BTU Holdings, the allegations of the contract claim are enough"to raise a right to relief above the speculative level. .. [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact)..." Iannacchino v. Ford Motor Co., 451 Mass. 623, 635-36 (2008), quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557 (2007). They state at least the general business terms—$20,000 per year with 5% annual increases; directorships in BTU Holdings and its affiliates; participation in major management decisions—with reasonable clarity. Nor is there anything particularly out of the ordinary about an agreement by which a company undertakes to compensate a director—even handsomely—for his services.[9] Count II thus states a claim against BTU Holdings.
The same cannot be said, however, of the contract claims against Al-Mazeedi and Oishi personally. The complaint relies heavily, and infelicitously, on the passive voice in describing the contractual obligation (“the defendants and Hayat agreed that Hayat would be paid a sum of $20,000 a month . . .” (¶15); “a contract by which Hayat would receive $20,000 per month ...” (8147)). When it turns to the subject of breach, however, it alleges that “the Defendants have caused Holdings to fail to pay Hayat his agreed-upon compensation” (¶19; emphasis supplied), seemingly denoting a corporate, not an individual, obligation.
This last is scarcely surprising: an undertaking by two shareholders personally to compensate a third for his services to the corporation falls well outside the realm of ordinary business dealings and expectations. If such truly is Hayat’s contention, it deserves a good deal more specificity than the complaint supplies. As to the individual defendants, therefore, Count II fails the requirement that the complaint set forth “factual ‘allegations plausibly suggesting (not merely consistent with)’ an entitlement to relief . . . ,” Iannacchino, 451 Mass. At 636, quoting Bell Atl. Corp. 550 U.S. at 557, and will be dismissed.
2. Statute of Frauds.
The defendants premise their statute of frauds argument on G.L.c. 259, §1, which provides that “(n]o action shall be brought . . . [u]pon an agreement that is not to be performed within one year of the making thereof. . . unless the promise, contract or agreement upon which such action is brought, is in writing and signed by the party to be charged . . .” The amended complaint does not specify whether or not the agreement to compensate Hayat was in writing.[10]
I assume here that in a claim on a contract entered into at a location unnamed, between a Kuwaiti resident and a Cayman Islands corporation with international interests and an operational headquarters in Massachusetts, the Massachusetts statute of frauds applies. See Bushkin Associates, Inc. v. Raytheon Co., 393 Mass. 622 (1985) (applying a multifactorial, interest-based choice-of-law analysis to selection of the appropriate statute of frauds). The parties assume this as well.
That said, this particular statute of frauds has been applied “only to contracts which by their terms cannot be performed within the year. It does not apply to contracts which may be performed within, although they may also extend beyond, that period.” Boothby v. Texon, Inc., 414 Mass. 468, 479 (1993), quoting Doherty v. Doherty Ins. Agency, Inc., 878 F.2d 546, 551 (1st Cir.1989), and Rowland v. Hackel, 243 Mass. 160, 162 (1922). Thus, even an oral contract for lifetime employment is enforceable, because the employee might die, or the employer might discontinue its business or terminate the employee for poor performance, within one year. Id.
Although the contract alleged in this case, with its guaranteed annual increases, clearly contemplated a long-term relationship, the complaint does not allege that BTU Holdings’s obligations under it were to outlive Hayat himself. Therefore, it does not qualify as “an agreement that is not to be performed within one year of the making thereof,” as the Massachusetts cases have construed this language. Count II therefore states a cause of action, but only against BTU Holdings.
C. Count III: Diversion of Corporate Opportunity.
Count III, alleging misappropriation of a corporate opportunity and of corporate assets, asserts claims that under Massachusetts law may only be brought derivatively on the corporation’s behalf. See, e.g., Fronk v. Fowler, 456 Mass. 317, 332 n.23 (2010), and cases cited, particularly Bessette v. Bessette, 385 Mass. 806 (1982). The same is true under British and Cayman law. See Renova Resources Private Equity Limited v. Gilbertson, [2009] CILR 268, 273—75 (Grand Court[11] Foster, Ag.J.); Foss v. Harbottle (1843), 2 Hare 461, 67 E.R. 189.
The defendants protest that the complaint does not, as required,
allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, *249 from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort.
Mass.R.Civ.P. 23.1.
Were this issue governed by Massachusetts law, the defendants would have a point: the complaint refers (at ¶40) to “a series of written requests in February and March 2008 for Holdings to address his grievances” that “failed to yield results,” but is nowhere more particular than this on the subject of demand. See Johnston v. Box, 453 Mass. 569, 578 (2008) (Rule 23.1’s particularity requirement imposes “a higher standard than ordinary notice pleading”).
The existence and contours of any requirement of pre-suit demand upon the Board of Directors, however—as well as the circumstances in which demand (if required) may be excused—are governed by the law of the jurisdiction of incorporation. Johnston v. Box, 453 Mass. 569, 575 (2009), citing Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-09 (1991). In fact, Cayman law has no demand requirement for derivative actions. Instead, it has Order 15, Rule 12A of the Grand Court Rules (1995 Rev. Ed.), which provides that “(w]here a defendant in a derivative action has given notice of intention to defend, the plaintiff must apply to the Court for leave to continue the action.” (0.15, R.12A(2).) There is then a hearing, following which the court may grant leave to continue the action, or may dismiss it, or may “adjourn the application and give such direction as to joinder of parties, the filing of further evidence, discovery, cross examination of deponents and otherwise as it may consider expedient.” (0.15, R.12A(8).)
The “application to continue” procedure in shareholder derivative cases has its origin in English law, and is intended “to provide a safeguard to prevent vexatious or inappropriate claims, which [are] not in the interests of the company concerned to pursue.” Renova Resources, [2009] CILR at 275. At the hearing on the plaintiffs application for leave to continue, the plaintiff
should satisfy the court that he has a prima facie case in relation both to the merits of the claim by the company and, secondly, that the alleged wrongdoing has been perpetrated by the majority who are in control or are otherwise in a position to prevent the company from pursuing the claim against them.
Id. at 276, citing Foss v. Harbottle and Prudential Assur. Co. Ltd. v. Newman Indus. Ltd. (No. 2), [1982] Ch. 204, 221; [1982] 2 W.L.R. 31; [1982] 1 All E.R. 354.
The British/Cayman procedure thus differs from the American demand requirement in that the court alone makes the judgment whether the action is to proceed, and it is purely a legal judgment concerning the merits of the claim; there is apparently no opportunity for a disinterested Board of Directors (or, if a majority of the Board is not disinterested, an independent litigation committee) to make a business judgment not to pursue a legally viable claim. Contrast, as to the American model, Harhen v. Brown, 431 Mass. 838, 842-45 (2000).
Plainly, Hayat may not be faulted for not having made a demand on the Board of Directors before commencing the action; under Cayman law, which controls, he was not required to do so. Rule 23.1’s requirement of particularized pleading on this issue is therefore a nullify for present purposes; it presupposes a demand requirement which, in this case, did not exist.
Nonetheless, BTU Holdings’ counsel suggested at oral argument that the complaint should be dismissed because the complaint did not allege with particularity “the reasons for [Hayat’s]. .. not making the effort” of a demand; viz., the fact that Cayman Law did not require it. Again, this requirement of Rule 23.1 makes sense where a demand requirement exists but may, on the right facts, be excused,[12] but it makes little sense where, as a matter of law, there is no demand requirement in the first place. If particularized pleading is nonetheless required, the factual allegation in paragraph 4 of the complaint that “BTU Holdings . . . is a corporation organized under the laws of the Cayman Islands” is particular enough. The rest is a matter of Cayman law of which the Court, with the parties’ help (as has been given here), is to take judicial notice. Mass.R.Civ.P. 45.1.
There remains the question of whether the Court ought to engraft an “application to continue” procedure, a la Cayman O.15, R. 12A, onto its proceedings in this case. Once again, I believe the answer is that the courts of the forum will follow our own procedural rules, absént any indication that the parties shaped their conduct with reference to the rules of another jurisdiction, or that the difference in procedure is likely to be outcome-determinative, or that the issue has traditionally been classified as “substantive” for choice-of-law purposes. Restatement §122, Comment a. No such concerns are present in this case. Our Rules of Civil Procedure provide ample opportunity for determination of the issues which, in the British and Cayman courts, would be addressed in an application to continue, whether on the pleadings (Mass.R.Civ.P. 12(b)(6)), on a documentary record (Rule 56), or at a trial of all issues or of such preliminary, “separate issue[s]” as may be pertinent to the viability of the derivative claims (Rule 42(b)).
For purposes of the motion to dismiss now before me, the Amended Complaint adequately pleads (a) facts giving rise to a viable claim or claims by BTU Holdings, and (b) “that the alleged wrongdoing has been perpetrated by the majority who are in control or are otherwise in a position to prevent the company from pursuing the claim against them.” Renova Re *250 sources, [2009] CILR at 275. The motion to dismiss is therefore denied as to Count III.
D. Count IV: Claim for Declaratory Judgment.
Count IV, referencing the rest of the complaint, asserts that “[t]here exists an actual controversy with respect to the scope of Hayat’s rights as a shareholder of [BTU] Holdings,” and that unless the controversy is resolved the defendants will continue to freeze him out of the corporation. This Count, too, states a claim upon which relief can be granted.
The purpose of the declaratory judgment procedure is to remove uncertainty. In this case, it will “enable the parties to deal intelligently with the situation before them, to agree between themselves as far as possible, and to reduce as much as possible the area of future litigation.”
Oxford v. Oxford Water Co., 391 Mass. 581, 585 (1984) (citation omitted).
ORDER
For the foregoing reasons, the defendants’ Motion to Dismiss Verified Amended Complaint is ALLOWED IN PART, in that Count II is dismissed against defendants Al-Mazeedi and Oishi only, but is otherwise DENIED.

In what it calls “[a] particularly egregious example” of the defendants’ manipulation of the BTU companies’ affairs at Hayat’s expense, the complaint alleges that BTU Power Company II purchased a 50% stake in Meiya Power Company, which operated power plants in Asia. BTU Power Company II’s stock was 100% owned by BTU Power Management Company, whose stock was 100% owned by BTU Holdings. Initially, BTU Power Management had the contract to manage BTU Power Company II—so far, so good—but in October 2005 (after the falling-out between Hayat and Al-Mazeedi) the contract was transferred to BTU Power Management Asia, an entity controlled by Al-Mazeedi and Oishi (not BTU Holdings or Hayat).
In May or June 2007Al-Mazeedi arranged for a below-market sale of all of Meiya Power’s stock (the 50% owned by BTU Power Company II and the other 50% held by outsiders) to Standard Charter Bank, for $306 million. Investors were repaid their capital plus a “minuscule return,” after which $85 million remained. Al-Mazeedi has claimed this went to pay “expenses,” but won’t account. By agreement reached before (and, by implication, in exchange for) the below-market sale to Standard Charter Bank, another company wholly owned by Al-Mazeedi and Oishi—BTU Industries, Ltd.—received an $8 million “consulting fee” from the Bank, in which Hayat has not been invited to share.

Accordingly, the parties have supplied me with authorities from the Cayman Islands, England, New Zealand, Australia, and even one case (anachronistically, it would seem) from Ireland. Cayman statutes, rules of court, and recent reported cases are available on the excellent website of the Cayman government’s Judicial Administration & Portfolio of Legal Affairs, found at http://www.caymanjudicicd-legalinfo.ky, to which I have also resorted.

See Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578 (1975).

CVC/Opportunity was a decision of the Judicial Committee of the Privy Council, which functions as the Cayman Islands’ highest appellate court. Ebrahimi was a decision of the House of Lords, which fills the same niche in the English system.

Lord Wilberforce addressed (at [1973] A.C. at 380) the particular application of the “just and equitable” clause to a freeze-out, as follows.
My Lords, this is an expulsion case, and I must briefly justify the application in such cases of the just and equitable clause. The question is, as always, whether it is equitable to allow one (or two) to make use of his legal rights to the prejudice of his associate(s). The law of companies recognizes the right, in many ways, to remove a director from the board ... In all these ways a particular director-member may find himself no longer a director, through removal, or non-election; this situation he must normally accept, unless he undertakes the burden of proving fraud or mala fides. The just and equitable provision nevertheless comes to his assistance if he can point to, and prove, some special underlying obligation of his fellow member(s) in good faith, or confidence, that so long as the business continues he shall be entitled to management participation, an obligation so basic that, if broken, the conclusion must be that the association must be dissolved.

Even a winding-up order, moreover, would not necessarily result in BTU Holdings or its assets going on the block. Mr. Jones, for the defense, has opined that “as a practical matter” a court-appointed liquidator of BTU Holdings in a just-and-equitable winding-up would likely encourage one of the shareholders to buy out the other, or else would seek to divide the subsidiaries equitably among the principals. (Affidavit of Andrew Jones, ¶36.)

Foreign law may be applied to procedural matters where the parties have shaped their conduct with reference to the rules of another jurisdiction, or where the difference in procedure is likely to be outcome-determinative, or where the issue has traditionally been classified as “substantive” for choice-of-law purposes. Restatement §122, Comment a.

These sections are broadly consistent with traditional choice-of-law principles, under which “the law of the place where the action is brought regulates the remedy and its incidents, such as pleading, evidence and practice.” Levy v. Steiger, 233 Mass. 600, 601 (1919).

It also appears from the complaint that BTU Holdings paid Hayat his $20,000 a month up until January 2006, when the payments ceased. Amended Complaint, ¶19. Indeed, an affidavit filed by Al-Mazeedi earlier in the case asserts that this is so. Affidavit of Wael Al-Mazeedi, 3/17/08, 8116(e) (iii). The acknowledged fact of payment lends additional heft to the allegation that there was an agreement to pay.

Nor is it clear that it had to do so. In the pre-Civil Rules era, the plaintiff was not required to plead a writing, but if the complaint affirmatively alleged an oral agreement subject to the statute of frauds, a demurrer would lie. Weiner v. Lowenstein, 314 Mass. 642, 645 (1943). The Rules of Civil Procedure continue to treat the statute of frauds as an affirmative defense that must be raised in the answer. Mass.R.Civ.P. 8(c).

The Grand Court is the Cayman Islands’ trial court of general jurisdiction.

Demand-excused cases are, however, now all but extinct in derivative cases involving Massachusetts corporations. G.L.c. 165D, §7.42; Yameen v. Eaton Vance Distributors, Inc., 417 F.Sup.2d 100, 108-12 (D.Mass. 2005): In re ING Principal Protection Funds Derivative Litigation, 369 F.Sup.2d 163, 170 (D.Mass. 2005; Tauro, J.); Demoulas v. Demoulas Super Markets, Inc., 2004 WL 1895052 (Mass.Super. 2004; van Gestel, J.) [18 Mass. L. Rptr. 130] at n.3.