PER CURIAM.
S.A.M. ("the mother") and M.H.W. ("the father") are the unmarried parents of S.M. ("the child"), who was born on December 2, 2012. In October 2015, the father filed in the Talladega Juvenile Court a petition seeking to establish paternity and seeking custody of the child. The record reveals the following facts.
The mother and the father met in December 2009. They dated for a few months, and the father, who is a pharmacist, moved to Alaska. The parents kept in touch, and, in March 2012, the mother went to Alaska to visit the father. She became pregnant during her two-week visit, but the parents did not continue a romantic relationship after that visit.
At the time of the child's birth, the mother was employed as a camp director at a YMCA camp in Alabama; as part of her salary package, she was provided a home at the camp in which she and the child resided year-round. However, in late November 2014, the mother lost her employment.
Because she had lost her employment and had no immediate position available to her, the mother decided to take a four-month-long trip with a friend and the child. The mother and her friend camped and, at times, stayed in motels. The mother and the child also slept in the back of the mother's Jeep vehicle. They visited Yosemite National Park, Joshua Tree National *358 Park, Zion National Park, "Red Rock," and the Grand Canyon. The mother and her friend met other friends during the trip, including the mother's then-boyfriend, at different locations. The mother explained that her then-boyfriend would sleep in his own tent when he spent the night with them; she admitted that she might have spent some evenings in her then-boyfriend's tent, but, she said, she would do so only after putting the child to sleep in her tent or the Jeep vehicle and that she would return to her tent or the Jeep vehicle to sleep. The father, who had been on a trip to the Coachella music festival held in Indio, California, met them at Joshua Tree National Park; he stayed two nights, during which the child slept with him in his tent.
The mother testified that she desired to work for the United States Forestry Service and that she had applied in several western states, including Colorado and Washington, for a position as a forestry-service technician. She was hired as a forestry-service technician in Wenatchee, Washington, where she worked from May 31, 2015, through October 31, 2015. During those months, the mother left the child in Alabama in the care of W.M. ("the maternal grandmother") because, the mother testified, she did not have sufficient funds to pay for child care in Washington at that time. The mother contacted the child every day while she was in Washington.
The mother explained that, in order to become a permanent employee of the forestry service, one had to complete three years as a seasonal employee. As of the time of the May 2016 trial, she had been rehired for the same position for the May to October 2016 season, expected to earn between $12 and $13 per hour, and expected to work between 50 and 60 hours per week. The mother further testified that she intended to take the child with her to Washington in 2016. The mother testified that she had rented a three-bedroom, two-bathroom home in which she and the child would reside. She said that the child support the father would be paying under the pendente lite agreement the parties had reached would enable her to hire a college-age nanny, who would reside with her and the child in Washington.
The mother admitted that, at the time of her deposition, which had been taken in March 2016, she had intended, if she were rehired for the position in Washington, to leave the child with her mother and to return to Alabama after her seasonal employment ended. She said, however, that the increased child support enabled her to secure child care and led to her decision to take the child with her. She also explained that her ability to take the child with her to Washington impacted her plans after her seasonal employment ended.
Regarding her future plans, the mother testified that she expected that she would be rehired for her third seasonal-employment season in 2017 and that she would then qualify for a permanent position. She also explained that she hoped to be able to stay in Washington after completing the 2016 season. She explained:
"I've got the option to live up there year round. I have the option to work at the supervisor's office at the end of my time in the field. I have the option to spend time with [the child] during those months. But right now I can't make a decision because I don't know what in the end [the father] is going to be helping with or anything like that."
When asked about the opportunities for the child in Wenatchee, the mother explained that Wenatchee was located on the Columbia River and said that it was a leading producer of apples. She said that the area had a cultural arts center and apple festivals in which the child could *359 participate. In addition, she noted that water sports were available on the river and that snowboarding and skiing were available at a local resort.
The father testified that he is a pharmacist. He said that he had worked as a pharmacist in Alaska and that he was, at the time of trial, employed as a pharmacist in a hospital pharmacy in Steamboat Springs, Colorado. He explained that his hours were 10:00 a.m. to 6:00 p.m. each weekday, that he worked 40 hours a week, and that he earned $52 per hour.[1] He testified that the hospital had a day-care facility for the child to attend but that it closed at 5:30 p.m. According to the father, his supervisor had assured him that he could bring the child to the hospital pharmacy during the last 30 minutes of his shift, where the father intended to "put [him] in the back with a coloring book."
The father further testified that he lived in a one-bedroom, garage apartment "along a back alley (inaudible) that's tucked in downtown Steamboat." He said that he had a trundle bed on which the child could sleep. He also stated that the child could sleep anywhere he wanted, including in the main bed.
The father testified that the child would have access to skiing and other outdoor activities in Steamboat Springs. He also noted that the school in the area was a "school of distinction." The father testified that he usually rode his bike to work but that he also had access to public transportation.
The maternal grandmother testified that the child had remained in her care while the mother worked in Washington between May 31 and October 31, 2015. She said that the mother and the child had had contact of some sort every day. She described the child as independent and noted that he had a large vocabulary. She commented that he loves participating in outdoor activities with the mother, including swimming, hiking, and camping.
The juvenile-court judge questioned the mother extensively during her testimony. The judge quizzed her about whether the four-month trip was of benefit to the child, whether driving across the country with a toddler was dangerous, and whether the child would remember the trip. The juvenile-court judge indicated that he found the mother's decision to make the trip with the child indicative of a lack of stability:
"THE COURT: Listen, and that's why I'm trying to draw a thin line here because I don't think it's the Court's province to step in morality [ (sic) ] and being that you want to raise your child as a granola child, that's your right. But stability is important to children."
The juvenile-court judge then questioned the mother about why she did not want the father to be given custody of the child:
"THE COURT: What have you seen [the father] do to make you believe that he would ever hurt or neglect that child?
"THE MOTHER: It is not that I feel like [the father] is going to do anything bad to the child as far as-
"THE COURT: I said hurt or neglect. Neglect is bad. And neglect is not paying attention.
"THE WITNESS: Then-
"THE COURT: (Inaudible) those two words have got to cover something that's a (inaudible).
"THE MOTHER: Then if neglect includes not paying attention I just personally and I can-I'll give examples.
"THE COURT: Are you saying he stays out until 4:00 in the morning getting *360 drunk, does he do a bunch of drugs or is he hanging out at raves, what are you saying?
"THE MOTHER: So from [the father's] behavior in the past. I do know that he smokes marijuana or has in the past. I also know-
"THE COURT: Has he ever smoked marijuana in front of [the child]?
"THE MOTHER: Not to my knowledge. I don't-I haven't seen them together enough to know if that happens or not.
"THE COURT: Have you ever smoked marijuana?
"THE MOTHER: No."
The juvenile-court judge then began examining the mother about whether smoking marijuana makes a parent unfit.
"THE COURT: I asked you what concerns-have you ever seen him do anything that leads you to believe that he would hurt, neglect, do anything to harm the child, whether it's intentional or by accident?
"THE MOTHER: Right. And-
"THE COURT: And because you've seen him smoke marijuana before, not around the child, you believe he's going to neglect the child?
"THE MOTHER: Where I was going with that is I don't know if he smokes anymore or if he would smoke in front of [the child]. I just know that when people smoke [marijuana] they cannot be as observant and if he's going to be taking care of [the child] solely by himself and he decides to indulge in that habit, then who is going to be the other person-
"THE COURT: And my question is: What knowledge do you have that that's going to happen? When's the last time you saw him smoke marijuana?
"THE MOTHER: It was when I was in Alaska, it was years ago. And that's why I acknowledge the fact that I don't know if he does it anymore but it's something that I've seen him do prior that I don't know the answer to that I would like to be answered."
The juvenile court entered an order on July 12, 2016, in which it decided the paternity issue in accordance with the parties' stipulation of paternity, awarded physical custody of the child to the father, and ordered the mother to pay child support. The order stated, in pertinent part, as follows:
"2. The [father] is currently a resident of Steamboat Springs, Colorado[,] and has been since October 30, 2015[,] where he is employed as a Pharmacist. The [father] testified that he had every intention to remain where he is currently residing.
"3. The [mother] testified at the hearing that it was her intention to move to the State of Washington and seek employment with the National Park Service. She testified that this is not permanent employment and is, in fact, seasonal. She expected this employment to be available from May 2016 through October of 2016. She further testified that there are circumstances that might cause her to not obtain the full time employment which she seeks and that circumstances may require her to relocate.
"4. The Court finds that both parents obviously love the child; however, the Court believes that the child would benefit by being placed in the primary custody of the parent who could provide the most stability for the child. The [father] has been employed as a Pharmacist at his current location since October of 2015 and has testified that he has no intentions to change his residence or employment. On the other hand, the Court finds from the testimony that the *361 [mother's] present and future employment as well as her residential status is much more uncertain."
The mother filed a motion seeking reconsideration of the custody award on July 21, 2016. Because the parties considered the mother's motion to be a postjudgment motion, and because the juvenile court had not yet ruled on the mother's motion on August 1, 2016, the parties entered into a joint stipulation to extend the time for the juvenile court to rule on the motion to August 18, 2016. See Rule 1(b)(2), Ala. R. Juv. P. (providing that parties can expressly consent on the record to an extension of the 14-day period to rule on a postjudgment motion). After a hearing on the motion, the juvenile court failed to rule on the motion, and the parties considered it deemed denied by operation of law. Rule 1(B), Ala. R. Juv. P.; see also Rule 59.1, Ala. R. Civ. P. The mother appealed. However, because the juvenile court had not ruled on the mother's request for retroactive child support, which had been litigated at trial, the July 12, 2016, order was not a final judgment, and this court therefore dismissed the mother's appeal. See, S.A.M. v. M.H.W., 227 So.3d 1232 (Ala. Civ. App. 2017).
Subsequently, the juvenile court entered a judgment on April 25, 2017, declining to award retroactive child support to the mother and otherwise reaffirming the July 12, 2016, order regarding custody. The mother filed a postjudgment motion directed to the April 2017 judgment. Although the juvenile court held a hearing on the mother's motion, and although the parties expressly consented to the extension of the 14-day period to rule on the motion for an additional 14 days, see Rule 1(b)(2), the juvenile court failed to rule on the motion within 28 days of its filing, and the mother's motion was therefore deemed to have been denied by operation of law. See Rule 1(B). The mother timely appealed.
On appeal, the mother presents the following issues: (1) whether the juvenile court erred by failing to apply the factors set out in Ex parte Devine, 398 So.2d 686, 696-97 (Ala. 1981), and its progeny when determining custody, (2) whether the juvenile court erred in considering extrajudicial facts in determining custody, (3) whether the juvenile court erred by failing to include the CS-42 child-support-guideline form in the record, and (4) whether the juvenile court erred by failing to award retroactive child support.
We will first consider the mother's argument that the juvenile court impermissibly considered extrajudicial facts when making its custody determination. At trial, the mother, who, as noted above, was a seasonal employee of the forestry service, testified that she had concerns about the father's being attentive to the child if he were awarded custody because, she said, she knew the father had smoked marijuana in the past. During her testimony, the juvenile-court judge interjected several times to comment on what he viewed as the proclivity of "outdoor people," those employed in the forestry service, and residents of, or visitors to, the State of Washington to smoke marijuana. The juvenile-court judge specifically commented that he had been hiking in Washington and that "those type of people smoke marijuana" and that "acting like they don't is not being honest with the court." He asked the mother how she intended to protect her child from those in Washington who smoked marijuana and stated that the mother's concern over the father's past use of marijuana did not "make much sense" based on the mother's "choosing to place her child around a bunch of people who smoke marijuana," presumably by moving *362 to Washington and working for the forestry service.
The mother relies on two rules of evidence as bases for her challenge to the juvenile-court judge's statements. She first contends that the juvenile-court judge acted as a witness in the proceeding in contravention of Rule 605, Ala. R. Evid., which provides that "[t]he judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." Secondly, she contends that the juvenile court impermissibly took judicial notice of adjudicative facts in contravention of Rule 201, Ala. R. Evid.
We have found no Alabama caselaw interpreting Rule 605. However, our research has revealed that Rule 605 and Rule 201 are often considered together when a trial judge makes comments at trial regarding facts within his or her personal knowledge. We find instructive the discussion of Rule 605 contained in I Charles W. Gamble & Robert J. Goodwin, McElroy's Alabama Evidence § 94.05(1) (6th ed. 2009) (footnotes omitted):
"Obviously the trial court has broad power to question witnesses and to comment upon the evidence. Additionally, the court may take judicial notice of certain facts.... However, when the judge otherwise begins by comment to interject material and extrajudicial facts within the judge's own knowledge, and not properly noticed or judicially acquired, the judge may then be held to have become a witness in violation of Rule 605."
One of the federal cases cited in McElroy's- United States v. Paiva, 892 F.2d 148 (1st Cir. 1989) -contains a discussion helpful to an understanding of the prohibition contained in Rule 605, Fed. R. Evid.[2]
"The prohibition of Rule 605 anticipates situations where the presiding judge is called to testify as a witness in the trial-'where the judge abandons the bench for the witness stand.' Fed. R. Evid. 605 advisory committee's note. See Price Bros. Co. v. Philadelphia Gear Corp., 629 F.2d 444, 447 (6th Cir. 1980) ; United States v. Frankenthal, 582 F.2d 1102, 1107 (7th Cir. 1978) ; Kennedy v. Great Atlantic & Pacific Tea Co., Inc., 551 F.2d 593, 597 (5th Cir. 1977) ; Ouachita Nat. Bank v. Tosco Corp., 686 F.2d 1291, 1301 (8th Cir. 1982), aff'd 716 F.2d 485 (8th Cir. 1983) (en banc).
"We believe that Paiva's argument that the judge's explanation of a field test [on a white powder to determine whether the substance was cocaine] was impermissible is more properly addressed under federal caselaw governing a district court judge's power of comment and the inherent limitations on this power. See, e.g., Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933) ; Doherty v. Doherty Insurance Agency, 878 F.2d 546 (1st Cir. 1989) ; Aggarwal v. Ponce School of Medicine, 837 F.2d 17 (1st Cir. 1988) ; United States v. Love, 767 F.2d 1052 (4th Cir. 1985), cert. denied, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 890 (1986). A federal district court judge retains the common law power to explain, summarize and comment on the facts and evidence.
*363 Quercia, 289 U.S. at 469-70, 53 S.Ct. at 698-99 ; Doherty, 878 F.2d at 553 ; Aggarwal, 837 F.2d at 22 ; Wright & Miller, Federal Practice and Procedure § 2557 (West 1971). A district court judge also has the power to question witnesses. Fed. R. Evid. 614. See also Terrell v. United States, 6 F.2d 498, 499 (4th Cir. 1925). In commenting on the testimony or questioning witnesses, however, the judge may not assume the role of a witness. Quercia, 289 U.S. at 470, 53 S.Ct. at 699 ; Tyler v. Swenson, 427 F.2d 412, 416 (8th Cir. 1970) ; Terrell, 6 F.2d at 499. A judge may 'analyze and dissect the evidence, but he may not either distort it or add to it.' Quercia, 289 U.S. at 470, 53 S.Ct. at 699. If a judge exceeds the limitations on his power to comment and to question, such action may constitute prejudicial error and require reversal. See id. at 472, 53 S.Ct. at 700 ; Tyler, 427 F.2d at 417 ; Terrell, 6 F.2d at 500."
Paiva, 892 F.2d at 158-59.
The United States Court of Appeals for the Ninth Circuit explained in United States v. Lewis, 833 F.2d 1380 (9th Cir. 1987), that a trial judge may not base his or her findings on his or her personal experiences because doing so violates both Rule 605, Fed. R. Evid., and Rule 201, Fed. R. Evid. The defendant in Lewis had challenged the voluntariness of her confessions, which were given after she had awoken after surgery and on the day following the surgery. Lewis, 833 F.2d at 1382-83. The trial judge remarked upon his experience after awakening from a general anesthetic:
" '...I am frank to say, I am influenced by personal experience. I mean, I represent to you that I have never been a heroin addict and I have never experienced what it is like to come out from under heroin, but I have come out from under an anesthetic. And people have told me that-and I seem to be perfectly all right-and people have told me that I said the most incredible things during the few first six hours or so after I came out of a general anesthetic. And I have had the same experience related by other people.
" 'You are not accountable for what you do or say for quite a number of hours after you come out of a general anesthetic. So I cannot find that a person who is both withdrawing from heroin and coming out from under a general anesthetic and is under arrest and confronted by FBI agents is in a position to make a voluntary and knowing statement at that time.' "
Lewis, 833 F.2d at 1384. The trial judge ruled that the defendant's confession had not been voluntary. Id. at 1383.
After first commenting that the trial judge had "candidly acknowledged that his determination of the issue ... was 'influenced by his personal experience,' " the Lewis court noted that, under Rule 605, Fed. R. Evid., "[t]he trial judge in this matter was not a competent witness" about the facts and circumstances surrounding the defendant's confession; the Lewis court specifically observed that "[t]here is no evidence in the record that a person is not accountable for what he or she says for several hours after receiving a general anesthetic." Lewis, 833 F.2d at 1385. The Lewis court went on to explain that a trial judge may not "rel[y] on his [or her] personal experience" to inform himself or herself of facts in order to take judicial notice of those facts:
"A trial judge is prohibited from relying on his personal experience to support the taking of judicial notice. 'It is therefore plainly accepted that the judge is not to use from the bench, under the guise of judicial knowledge, that which *364 he knows only as an individual observer outside of court.' "
Id. (quoting 9 J. Wigmore, Evidence in Trials at Common Law § 2569, at 723 (J. Chadbourn rev. ed. 1981)).
As the United States Court of Appeals for the Ninth Circuit has more recently stated, a "judge may not actually testify in [a] proceeding or interject facts (excluding facts for which proper judicial notice is taken)." United States v. Berber-Tinoco, 510 F.3d 1083, 1091 (9th Cir. 2007). In addition, the federal courts have stated that "[a] judge should never testify in the form of questions." Tyler v. Swenson, 427 F.2d 412, 416 (8th Cir. 1970). One reason for this prohibition is the prevention of the appearance of bias. See O'Quinn v. Hall, 77 S.W.3d 438, 448 (Tex. App. 2002) (applying Rule 605 of the Texas Rules of Evidence, which is similar to our Rule 605, and concluding that "[t]he trial court's determination of the date of notice was based on facts provided to the court by its staff, facts that the court provided at the hearing. This created the appearance of bias which rule 605 seeks to prevent."). In addition, allowing a trial judge to testify impinges on the right of cross-examination. Tyler, 427 F.2d at 416 ("This evidence came from the lips of the trial judge in questioning the mother and serves as testimony without the right of cross-examination by the petitioner.").
We have also found instructive the Tennessee Supreme Court's application of Rule 605 of the Tennessee Rules of Evidence, which is similar to our Rule 605. See Vaughn v. Shelby Williams of Tennessee, Inc., 813 S.W.2d 132, 133-34 (Tenn. 1991). The Tennessee Supreme Court, in a case involving a judge who had personally observed a workers' compensation plaintiff on occasion outside the courtroom, explained the prohibitions on a trial judge's use of extrajudicial facts thusly:
"Judicial knowledge upon which a decision may be based is not the personal knowledge of the judge, but the cognizance of certain facts the judge becomes aware of by virtue of the legal procedures in which he plays a neutral role. State v. Henderson, 221 Tenn. 24, 424 S.W.2d 186, 188 (1968). No judge is at liberty to take into account personal knowledge which he possesses when deciding upon an issue submitted by the parties. Laurance v. Laurance, 198 Or. 630, 258 P.2d 784, 787 (1953). In other words, '[i]t matters not what is known to the judge personally if it is not known to him in his official capacity.' Galbreath v. Nolan, 58 Tenn.App. 260, 429 S.W.2d 447, 450 (1967).
"Significantly, a judge is not permitted to make an investigation of a case, even an inadvertent one, off of the record, and then base a holding on the information obtained incident thereto. See State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989) ; Caldwell v. State, 164 Tenn. 325, 48 S.W.2d 1087, 1097 (1932) ; see also Moore v. Russell, 294 F.Supp. 615, 620-21 (E.D. Tenn. 1968) ('Whatever may have been the personal observations and individual views of the judge as a person, these factors have no place whatever in his exercise of judicial discretion.'). Moreover, when a judge becomes a source of evidence, appellate courts are put in an awkward position in that the character of the evidence obtained through private inquiry or observation, as well as its probative value, is not shown in the record, making an evaluation of the information on appeal difficult, if not impossible.
"Other than difficulties associated with appellate review, actions such as those taken by the trial judge in the present case create problems for the parties which can and should be avoided.
*365 Simply stated, by observing a party outside of the judicial proceedings, and then basing a decision on those observations, the judge becomes a source of evidence, in effect, a witness. Rule 605 of the Tennessee Rules of Evidence clearly prohibits a judge presiding over a trial from serving as a witness, and for good reason. Perhaps the most obvious one is that the system of justice does not appear to be impartial if the judge charged with the duty of adjudicating the litigation also acts as a source of evidence. See generally, Cohen, Tennessee Law of Evidence, § 605.1 at 247 (2d ed. 1990). Additionally, when the trial judge becomes a source of information, the parties may not be willing to cross-examine vigorously the judge whose goodwill is perceived to be important to the outcome of the case. Worse yet, the parties may not even get the opportunity to cross-examine the judge to begin with. The present case is a prime example. It seems appropriate that when the trial judge becomes a source of information, and when a decision is ultimately influenced by that information, the parties should have the opportunity to cross-examine in order to impeach the source of the evidence or otherwise persuade an impartial trier of fact that the court's observations are, for whatever reason, inaccurate, just as they would any other witness."
Vaughn, 813 S.W.2d at 133-34 (footnotes omitted; emphasis on "source" original, other emphasis added). Because the trial judge had considered his extrajudicial observations in making his decision, the Tennessee Supreme Court reversed the judgment and remanded the cause for a new trial with a different trial judge. Id. at 134.
Furthermore, contrary to the father's suggestion in his brief to this court, neither the juvenile court nor this court can take judicial notice of "Washington's statutes ... or countless[, but unspecified,] reputable and reliable news media sources" to support a conclusion that recreational use of marijuana is legal in the State of Washington (and, therefore, presumably that those who participate in outdoor activities in that state or are employed by the forestry service in that state engage in said recreational use of marijuana).See Ex parte Ebbers, 871 So.2d 776, 794 (Ala. 2003) ("[W]e know of no legitimate basis for taking 'judicial notice' of copies of news articles."); Gavin v. State, 891 So.2d 907, 987 (Ala. Crim. App. 2003) (same); Hammack v. Moxcey, 220 So.3d 1053, 1059 (Ala. Civ. App. 2016) (quoting Whitworth v. Dodd, 435 So.2d 1305, 1307 (Ala. Civ. App. 1983) ) (" 'The courts of Alabama do not take judicial notice of the law of a sister state, whether statutory or otherwise.' "); and Johnson v. Johnson, 469 So.2d 116, 118 (Ala. Civ. App. 1985) (explaining that an Alabama court "cannot take judicial knowledge of the laws of a sister state"). The "facts" regarding the use of marijuana by forestry-service employees, outdoor enthusiasts, and those living in, or pursuing recreational activities in, Washington are not facts of which a trial court may take judicial notice because they do not meet the requirements for judicially noticed facts set out in Rule 201(b), Ala. R. Evid.: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."
The comments by the juvenile-court judge regarding the common knowledge of the use of marijuana by outdoor enthusiasts, those employed by the forestry service, and those living in, or pursuing *366 recreation in, the State of Washington contained, much like the comments regarding the effect of general anesthesia by the trial-court judge in Lewis, extrajudicial facts that the juvenile-court judge has gleaned from his own personal knowledge or beliefs. The juvenile-court judge was not commenting on the evidence presented. Instead, he was reporting his own personal observations regarding marijuana use by certain groups of persons or those in a certain locale. The parties, and particularly the mother, were, like the defendant in Vaughn, unable to cross-examine the juvenile-court judge about his testimony concerning marijuana use in Washington or among forestry-service employees and outdoor enthusiasts. Moreover, the mother was not permitted the opportunity to persuade an impartial fact-finder that, in fact, the mother was not moving to Washington to live among marijuana-smoking outdoor enthusiasts and forestry-service employees or that she was not being dishonest to the court about the proclivities of those groups of persons to smoke marijuana. Thus, we conclude that the comments made by the juvenile-court judge were improper and violated both Rule 605 and Rule 201.
However, our inquiry does not end there. The mother contends that the juvenile-court judge's comments contained extrajudicial facts that formed the basis for the juvenile court's adjudication. The father, to the contrary, contends that the juvenile court did not rely on the comments as establishing adjudicatory facts but instead used those comments to assess the mother's credibility regarding her stated concerns over the father's relative fitness to be the child's custodial parent. Indeed, the juvenile-court judge stated on the record at the hearing on the mother's July 21, 2016, motion to reconsider the July 12, 2016, custody order that his intent was to demonstrate that the mother's concerns over the father's alleged use of marijuana were illogical or hypocritical.
"THE COURT: I was offended by the fact that she was so offended that her child would be around someone who-the only testimony was that he had smoked marijuana. I mean that, in and of itself, to me, does not make somebody an unfit parent. There's no other testimony as to the circumstances under which [he] smoked marijuana, how often [he] smoked marijuana, any facts whatsoever in regards to drug uses other than the fact that [he] smoked marijuana. And my point in what I was saying was you're so worried about him being around your child when you can say he has smoked marijuana in his lifetime that the people-people in Alabama, you cannot grow up and not be around people who've smoked marijuana at one point in their life. And to be offended or worried about your children being around those people in their presence without knowing more other than them smoking marijuana one time is an overreaction. That was the point I was making.
"....
"THE COURT: I didn't consider any of that, ma'am. I've already told you that what I discussed with her was not considering any information. It was saying that it's common knowledge-it was in response to making such a big deal over the marijuana when you put no context in the testimony. Being someone testing positive for marijuana or someone saying they used marijuana and the Court not knowing the facts which surround that usage does not put the Court on a very good basis to start considering that in regards to custody."
Thus, we must determine whether the extrajudicial remarks formed a crucial basis of the juvenile court's decision or *367 whether those remarks, which are "neither to be encouraged nor commended," see Ex parte Adams, 211 So.3d 780, 791 (Ala. 2016), amount to merely harmless error. See Rule 45, Ala. R. App. P. (explaining that an appellate court may not reverse a judgment unless "the error complained of has probably injuriously affected substantial rights of the parties"); Paiva, 892 F.2d at 159 (applying the harmless-error rule to a Rule 605 violation). The juvenile-court judge stated on the record that he had not based the custody determination on the marijuana issue. However, the juvenile-court judge indicated that he had attempted to communicate to the mother that her concern over the father's past use of marijuana was an "overreaction," indicating that the juvenile-court judge had used the extrajudicial "facts" about the use of marijuana to determine that the mother was unduly and irrationally concerned about the child's potential exposure to marijuana through the father (despite the fact that she had clearly indicated that she was not certain whether the father continued to smoke marijuana and had simply mentioned that she would be concerned about his ability to parent if he still used marijuana and did so while the child was in his custody) as opposed to those persons with whom the mother might have contact in Washington.
The frequency and tenor of the juvenile-court judge's remarks make it difficult to conclude that the juvenile-court judge did not draw negative conclusions about the mother based on what he stated that he perceived to be the mother's "overreaction." In fact, as already mentioned, the juvenile-court judge indicated that the mother was "not being honest with the Court" based on her failure to admit that "those type of people smoke marijuana." Despite his assertion that he had not focused on the marijuana issue, the juvenile-court judge, on the record, accused the mother of "choosing to place her child around a bunch of people who smoke marijuana."
We cannot conclude that the juvenile-court judge's remarks, which accuse the mother of dishonesty and of behavior that might endanger the welfare of the child based on the juvenile-court judge's personal observations or beliefs about the proclivity of outdoor enthusiasts, forestry-service employees, and the residents of, or visitors to, Washington to use marijuana, amount to harmless error in this context, where the suitability of a parent for the custody of a child turns on, in part, that parent's character. See Ex parte Devine, 398 So.2d at 696 (including as a factor relevant to child-custody determinations "the characteristics of those seeking custody, including age, character, stability, mental and physical health"). Accordingly, in light of the juvenile-court judge's violation of Rule 605 and Rule 201, we reverse the judgment of the juvenile court, and we remand this cause for a new trial before a different judge. See Vaughn, 813 S.W.2d at 134. In light of our resolution of the appeal on this issue, we pretermit the mother's other arguments. Frazier v. Curry, 119 So.3d 1195, 1197 (Ala. Civ. App. 2013) (citing Favorite Mkt. Store v. Waldrop, 924 So.2d 719, 723 (Ala. Civ. App. 2005) ) (explaining that appellate courts will pretermit other arguments on appeal when one argument is determinative of the appeal).
REVERSED AND REMANDED WITH INSTRUCTIONS.
Thompson, P.J., and Pittman, Thomas, Moore, and Donaldson, JJ., concur.

The father testified that he had earned $85 per hour when he worked in Alaska.

Rule 605, Fed. R. Evid., and Rule 201, Fed. R. Evid., are substantially similar to our corresponding rules. Thus, federal caselaw interpreting those federal rules is persuasive authority. See, e.g., Burgin v. State, 747 So.2d 916, 918 (Ala. Crim. App. 1999) (noting that, "[b]ecause there is little Alabama caselaw interpreting Rule 607, [Ala. R. Evid.,] we must look to the federal courts' interpretation of Rule 607 of the Federal Rules of Evidence, which is identical to the Alabama rule.").